**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,       : <br>       : <br>       : <br> Plaintiff,       : <br>       : <br> v.       : <br>       : <br> ALFRED S. TEO, SR., et al.       : <br>       : <br> Defendants.       : | Civil Action No. 04-1815 (SDW) <br><br><br> **OPINION** |

**ARLEO,** U.S.M.J.

Before the Court is the Motion of Defendants, Alfred S. Teo, Sr. ("Teo") and the M.A.A.A. Trust ("the Trust") ("Defendants"), to quash the subpoena served by Plaintiff, Securities and Exchange Commission ("SEC"), on Teo's attorney, James McKeon, Esq. ("McKeon"), and for an injunction to prevent the SEC from using privileged communications previously produced during the parallel criminal proceeding, pursuant to Fed. R. Civ. P. 45. (Dkt. Entry No. 147). The SEC opposes this motion.

On April 3, 2008, December 11, 2008, and March 5, 2009, the Court held oral argument in connection with the motion, pursuant to United States v. Zolin, 491 U.S. 554 (1989), and Haines v. Liggett Group, Ltd., 975 F.2d 81 (3d Cir. 1992). The Court issued several rulings from the bench resolving the majority of disputes relevant to Defendants' motion to quash, pursuant to Local Civil Rule 52.1, and indicated that a written comprehensive opinion would be forthcoming. This written opinion supplements the Court's oral opinions, pursuant to Rule 52.1. It also addresses Defendants'

motion for a use injunction.  As set forth in more detail below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to quash, and **DENIES** Defendants' application for a use injunction.

## I.     FACTUAL BACKGROUND

This SEC enforcement action arises out of Teo's alleged multi-year fraudulent scheme to conceal his true beneficial ownership of Musicland Stores Corporation ("Musicland") stock held by the Trust, and to cause materially false and misleading statements and omissions in SEC public filings.[1]

In or about 1979, McKeon began representing Teo in a variety of legal matters.  (See June 25, 2008, Declaration of Eva Ciko Carman ("Carman Decl."), Exh. 3 at 18:9-18).  Among those legal matters, McKeon created the Trust for the benefit of Teo's four sons in 1992.  (See id. at Exh. 4).  In December 1994, co-trustees, Annie Teo (Teo's wife) and Teren Seto Handelman ("Handelman") (Teo's sister-in-law) executed authorizations, allowing Teo to trade securities for the Trust.  (See July 9, 2008 John Murray Declaration ("Murray Decl."), Exh. 12 at MSC 03289-03290).

In 1995, Musicland created a Shareholder Rights Plan between itself and its shareholders, which the parties refer to as a poison pill agreement ("poison pill").  Under the poison pill, if a shareholder or a group of shareholders acquired 17.5% of Musicland's outstanding shares, the

---

[1] Under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d) ("section 13(d)"), Teo and the Trust's material investments in public companies, including Musicland, triggered their obligation to file certain forms with the SEC.  One such public filing at issue is a Schedule 13D, which must be filed when an investor or group of investors acquire beneficial ownership of more than 5% of a public company's shares.  See 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1.

company's board of directors had the option to issue a large number of shares to all shareholders except the one owning 17.5% or more to dilute the 17.5% owner's interest. Both Teo and McKeon were aware of the poison pill.  (See Murray Decl., at Exh. 6 at 88:2-21; Exh. 29 at 62:2-19).  It is undisputed that Musicland's board of directors never triggered the poison pill.

In September 1996, Teo began purchasing shares of Musicland stock on behalf of the Trust and himself. (See id. at Exh. 7 at MSC 03452; Exh. 20 at 1).  By February 1997, Teo and the Trust's combined Musicland stock holdings reached more than 5% of Musicland's outstanding shares, triggering their obligation to file a joint Schedule 13D with the SEC.[2]  (See id. at Exh. 7).  McKeon prepared and filed such forms with the SEC.  (See id.)  In November 1997, Diane Chaikin, legal assistant of Musicland ("Chaikin"), wrote to McKeon, reminding him that Teo and Annie Teo's recent purchase of additional Musicland shares pushed their ownership near the 17.5% poison pill threshold.  (See id. at Exhs.  9 & 10).  A week later, Teo, Annie Teo, and the Trust jointly filed an amendment to the Schedule 13D, reporting that they cumulatively owned 16.16% of Musicland stock.  (See id. at Exh. 8).

On April 18, 1998, Annie Teo and Handelman signed revocations of Teo's authority to trade securities and vote on behalf of the Trust.  As a result, Teo and the Trust "decoupled," meaning their shares of Musicland stock counted separately, and they began filing separate Schedules 13 D and amendments. On that same date, Annie Teo resigned as co-trustee for the Trust. (See id. at Exh. 12, MSC 03289-03293.)

_____

[2] Teo's companies Alpha Industries, Inc. Retirement Plan, Alpha Technologies, Inc., and Lamda Financial Service Corporation ("Teo's companies") were among the reporting persons listed on these February and November 1997, joint filings. However, Teo's involvement with these companies is not relevant to Defendants' instant motion.

3

In July 1998, Musicland executives became concerned that Teo's 16.88% total ownership of Musicland stock was fast approaching the 17.5% poison pill threshold. As such, they sought confirmation from McKeon that neither Teo nor his wife were considered beneficial owners of the Trust securities under the applicable securities laws. (See Murray Decl., Exh. 11). Chaikin informed Musicland executives that McKeon was unaware of Teo's recent purchase of an additional 425,000 shares. Yet, McKeon assured Chaikin that he would file an amended Schedule 13D to reflect these purchases and the April 1998 revocations of Teo's beneficial ownership over the Trust. (See id.)

On July 30, 1998, McKeon filed another amendment to the Schedule 13D, reflecting the stock owned by Teo, Annie Teo, and Teo's companies ("July 30, 1998 Amendment") (Murray Decl. at Exh. 12, MSC 03293-03307). However, for the first time in a public filing, Teo did not report the Musicland shares held by the Trust. Rather, the July 30, 1998 Amendment referenced the revocations of Teo's authorization over the Trust and Annie Teo's resignation as co-trustee of the Trust. (See id. at Exh. 12, MSC 03305 at ¶ 5).

In response, on July 30, 1998, Chaikin faxed correspondence to McKeon, seeking assurance that Teo was no longer the beneficial owner of the Trust securities and that Annie Teo was no longer co-trustee of the Trust. (See id. at Exh. 13). On July 31, 1998, McKeon wrote to Musicland's General Counsel, Heidi Hoard ("Hoard"), enclosing copies of Teo's July 30, 1998 Amendment, the April 18, 1998 revocations of authorization, and Annie Teo's April 18, 1998 resignation as co-trustee. (See id. at Exh. 12, MSC 03287-03288). Based on these enclosures, McKeon advised Hoard that Teo divested his beneficial ownership over the Trust, and thus, Teo need not report the Trust's stock on his Schedules 13D. (See id. at Exh. 13, MSC 03287).

McKeon filed two additional amendments to Teo and Annie Teo's Schedules 13D, on

4

September 3, 1998 and May 19, 1999, respectively. (See id. at Exhs. 18 & 19). As with the July 30, 1998 Amendment, these later SEC filings omitted any reference to the Trust as a reporting person. Both filings noted that Teo and Annie Teo could sell and vote only the Musicland stock that they owned jointly and stock owned by Teo's companies. (See id.)

However, a trading summary of Musicland stock owned by Teo, Annie Teo, the Trust, and Teo's companies demonstrates that Teo resumed trading securities on behalf of the Trust in October 1998. (See id. at Exh. 20). Indeed, in 2001, by his own admissions, Teo testified before the SEC that he always maintained trading authority for the Trust. (See id. at Exh. 6 at 157:11-21; Exh. 14 at 529:13-25 - 531:1-11). In 2001, Handelman similarly testified before the SEC that "Mr. Teo trades for the trust," unaware that his trading authority had been revoked in April 1998. (See id. at Exh. 15 at 38:20-25 - 39:1-22).

Yet, on February 9, 2000, McKeon filed a separate Schedule 13D on behalf of the Trust, reporting the Trust owned 6.96% of outstanding Musicland stock. (See id. at Exh. 20). On March 10, 2000, McKeon filed another amendment, disclosing the Trust owned 8.70% of Musicland's stock. (See id. at Exh. 26). Neither public filing indicated that Teo maintained any continued beneficial ownership over the Trust's shares. (See id. at Exhs. 20 & 26). Furthermore, in his March 22, 2000, correspondence to Hoard, Teo did not inform her that he owned more than 17.5% of Musicland's outstanding stock, when combined with the total number of shares owned by the Trust. (See id. at Exhs. 27 & 28).

## II.   PROCEDURAL HISTORY

### A.   Parallel Criminal Case Against Teo

On June 15, 2005, a federal Grand Jury, returned two Superceding Indictments against Teo.[3] United States v. Teo, et al., Crim. No. 04-583 (KSH).  The first Superceding Indictment, which is relevant to Defendant's instant motion, charged Teo with committing insider trading, creating a fraudulent scheme to conceal his beneficial ownership of Musicland stock, and causing materially false and misleading Schedules 13D and amendments to be filed with the SEC.

On September 5, 2005, the government filed an in limine motion to call McKeon as a trial witness to testify, among other things, about the allegedly false statements and omissions in the SEC public filings.  The government argued that the crime-fraud exception pierced any protected communications between McKeon and Teo concerning these disputed public filings.

On April 11, 2006, Judge Hayden held a hearing to determine if the government's proposed evidence in support of its case-in-chief against Teo established a prima facie showing of the crime-fraud exception. Specifically, the government offered evidence that Teo was aware of the following: Musicland's poison pill; his SEC obligations to cause truthful accurate public filings;  his stock holding's encroachment on the poison pill threshold;   and Musicland's knowledge of Teo's encroachment. (See Murray Decl., Exh. 30 at 75:5-8; 1/5/06 Gov't Bf at 9-22, dkt. entry. no. 115, 04-cr-583). The government proffered that Teo purportedly divested his beneficial ownership of the Trust's shares to avoid triggering the poison pill. (See 1/5/06 Gov't Bf at 22).  Yet, Teo admitted and Handelman confirmed that he always maintained trading authority over the Trust and continued

---

[3] On August 18, 2004, Teo and two other co-defendants were indicted on the original 46-count Indictment.

to so trade even after "decoupling."  (Id.)

Based on the aggregation of the government's proposed evidence, Judge Hayden concluded

as follows:

> [T]here is a prima facie showing that Teo was engaged in an effort to
> produce documents, respond to questions, and otherwise satisfy
> inquisitors and interested parties that he was not intending to or in a
> position to come or cross over the line that would otherwise trigger
> the poison pill and undercut his intent to profit as much as he could
> by Musicland . . . . And to the extent that Mr. McKeon was involved
> in the creation of those documents or in conversations relevant, ....
> [I]f in fact the McKeon testimony does square up with that purpose,
> then it may come in notwithstanding that McKeon was Teo's
> attorney. . . .  I'm saying that the prima facie showing to me is
> satisfactory, and therefore McKeon may testify.

(See Murray Decl., Exh. 30 at 75:8-15, 17-20, 23-25; 76:10-11).  On April 17, 2006, Judge Hayden

entered an Order, granting the government's motion and allowing the government to question

McKeon at trial about those attorney-client communications which fell within the Court's ruling.

Additionally, Judge Hayden held that McKeon's testimony could be discussed at trial.  (See 4/11/06

Order).  Teo never sought an order sealing McKeon's testimony and never appealed Judge Hayden's

Order.

Thereafter, on May 16, 2006, the case was tried before a jury under the first Superceding

Indictment.[4]  Following Judge Hayden's ruling, McKeon testified about his communications with

Teo on various topics, such as the revocation of Teo's trading authority on behalf of the Trust.

During his testimony, McKeon referenced his handwritten notes and other documents concerning

---

[4] After the trial commenced, on June 27, 2006, Teo pled guilty to insider trading for the
purchase of shares of Musicland stock and another company's stock, C-Cube Microsystems.
These charges, however, are not relevant to Defendants' instant motion to quash.

his communications with Teo, which, at the time, had not been produced to the government.[5]

After McKeon testified, Teo's counsel voluntarily produced McKeon's notes and documents. (See SEC 7/9/08 Opp. Bf at 13-14). Six of those documents were written communications between McKeon and Teo. The government sought to introduce additional evidence and recall McKeon as a witness. The government electronically filed these six documents electronically with the Court. (See id. at 14; see also Murray Decl., Exhs. 32-37). In response, Teo's attorney electronically filed a letter, attaching McKeon's additional notes detailing conversations with Teo in 1998. (See SEC 7/9/08 Opp. Bf at 14; see also Murray Decl., Exhs. 38-39). Teo never sought an order sealing the eight electronically filed documents (hereinafter referred to as "Exhibits 32-39").[6]

### B.    Pending SEC Civil Enforcement Action

The SEC's main theory of liability here is that Teo sought to conceal the extent of his true ownership and control of Musicland stock, including six million shares, to avoid triggering Musicland's poison pill. The SEC alleges that Teo thereafter sold those shares realizing a profit of approximately $22 million. (See Compl. at ¶ 4). In its Complaint, the SEC essentially asserts that Teo and the Trust's July 1998 through March 2000 Schedules 13D and amendments contained false and misleading statements or omissions in violation of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j ("section 10(b)"), and Rule 10b-5 thereafter. (See id. at ¶¶ 184-186.) As discussed in more detail below, these allegations and legal claims are the subject of the challenged subpoena.

---

[5]  The SEC has attached portions of McKeon's criminal trial testimony to the Murray Declaration as Exhibit 31.

[6] The parties agree that these eights documents are attached to the Murray Declaration as Exhibits 32-39.

C.    SEC's Subpoena Served on McKeon

During discovery, the SEC served a subpoena on McKeon. In the subpoena, the SEC seeks

two main categories of documents. The first category consists of those eight documents referred to

as Exhibits 32-39, which were filed publicly in both the criminal case and this civil enforcement

action. Defendants have moved for the issuance of a use injunction to prevent the SEC from using

Exhibits 32-39 in this action, and further seek the return of these documents to McKeon and

Defendants. The second set includes those documents that the SEC has sought for the first time

during discovery in this civil action. Both categories of documents are the subject of Defendants'

motion to quash.

In opposing Defendants' motion, the SEC claims that McKeon's preparation and filing of

materially false Schedules 13D and amendments on behalf of Defendants, from July 1998 through

March 2000, trigger the crime-fraud exception to the attorney-client privilege. Alternatively, as to

Exhibits 32-39, the SEC maintains that Defendants have waived the attorney-client privilege because

Defendants failed previously to take any affirmative steps to preserve the privilege. The SEC further

contends that Defendants are collaterally estopped from arguing that the privilege applies because

Judge Hayden adjudicated the issue of the crime-fraud exception's application on the merits.

D.    Application of *Zolin* to Defendants' Motion to Quash

As a threshold issue, Defendants requested that before this Court could conduct an in camera

review of Exhibits 32-39, the Court first had to determine the applicability of the crime-fraud

exception without reliance on Exhibits 32-39, pursuant to Zolin, 491 U.S. at 554. In contrast, the

SEC argued that Zolin did not apply because Judge Hayden ordered those documents produced,

which were later publicly filed with the Court. Thus, Defendants waived any assertion of the

9

attorney-client privilege as to Exhibits 32-39.

        E.     <u>April 3, 2008 Hearing</u>

In <u>Zolin</u>, the Supreme Court held that "the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged." 491 U.S. at 575. Consistent with <u>Zolin</u>, this Court concluded that it was appropriate to rely on Exhibits 32-39 in conducting an <u>in camera</u> review of all the allegedly privileged documents subject to the SEC's subpoena. This Court's ruling was based on Judge Hayden's finding that Exhibits 32-39 were subject to the crime-fraud exception, and that they were placed in the public domain. (<u>See</u> Hearing Transcript, dated Apr. 3, 2008 ("4/3/08 Trans.") at 9:1-7, 19:8-13, 20:4-7). Therefore, the Court denied Defendants' application.[7] (<u>See</u> 4/3/08 Trans. at 19:14-19).

On April 24, 2008, Defendants appealed this Court's April 7, 2008, Order to District Judge Wigenton. Judge Wigenton affirmed.

**III.    DISCUSSION**

At issue are two primary questions: (1) whether Exhibits 32-39 are protected by the attorney-client privilege; and if so, are Teo and/or the Trust barred from asserting the privilege in this case as to those communications based on doctrines of waiver or collateral estoppel; and (2) whether additional communications between Teo and McKeon sought by the SEC, but not previously produced, are protected by the attorney-client privilege; and if so, are they subject to the crime-fraud exception.

---

[7] This Court subsequently held, without reference to Exhibits 32-39, that the SEC had made the threshold showing under <u>Zolin</u> based solely on the non-privileged documents provided to the Court. (<u>See</u> Hearing Transcript, dated Dec. 11, 2008 ("12/11/08 Trans.") at 16:15-17; 18:16-25 - 19:1-2). Accordingly, on April 7, 2008, the Court entered an Order, directing the SEC to produce Exhibits 32-39 for an <u>in camera</u> review.

A.      General Standard for the Attorney-Client Privilege

The purpose of the attorney-client privilege is to "encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "The potential societal benefit may be great in cases like the one at bar, where defendant[s] seek[] legal advice in order to act within the confines of highly complex federal securities laws." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991). The Third Circuit has adopted the following formulation of the attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Investigation, 599 F.2d 1224, 1233 (3d Cir. 1979).

The Third Circuit cautioned that "because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative' [the attorney-client privilege] [] must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" Id. at 1235. As such, courts must carefully consider the application of the privilege mindful that "it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." Fisher v. United States, 425 U.S. 391, 403 (1976). It is axiomatic that the privilege only protects communications not facts. See Upjohn, 449 U.S. at 395-96. The party

raising the attorney-client privilege bears the burden of showing that it applies to the disputed communications. See In re Grand Jury Empaneled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979).

        B.     Evidentiary Standard for Application of Crime-Fraud Exception

The Third Circuit has set forth a standard for determining the application of the crime-fraud exception to the attorney-client privilege. "[T]he party seeking discovery must make a prima facie showing of fraud or crime." Id. In other words, the party opposing the attorney-client privilege must present evidence constituting a prima facie showing that, if believed by a prudent person, would support that party's theory that the defender of the privilege perpetuated a crime or fraud. See Haines at 95-96. Specifically, a party meets its burden of establishing a prima facie case by showing that: (1) "the client was committing or intending to commit a fraud or crime," and (2) that "the attorney-client communications were in furtherance of that alleged crime or fraud." In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000). See Haines, 975 F.2d 95-96. A party's burden of establishing a prima facie case "is not a particularly heavy one." In re: Grand Jury Investigation, 445 F.3d 266, 275 (3d Cir. 2006).

As to the first prong, there needs to be "a reasonable basis to suspect perpetration of a crime or fraud." Id. If the proponent presents adequate evidence, then first prong is satisfied. Id. The second prong requires the court to consider whether the communication "was in furtherance of" the fraudulent activity. In In re: Grand Jury Investigation, the Third Circuit provided a reviewing court with the following guidelines. "[T]he crime-fraud exception applies even when attorney is unaware that the client is engaged in or planning a crime [or fraud]." Id. at 279 n.4 (internal citation omitted). Additionally, there must exist a temporal proximity between the fraudulent activity and the client's communications with the attorney. Id. Finally, the proponent of the exception "'does not have to

12

show that the intended crime or fraud was accomplished, only that the lawyer's advice or other services were misused . . . [i.e.,] evidence of some activity following the improper consultation. . . .'" Id. (internal quotation omitted).

Under Haines, if the party establishes a prima facie showing, the Court must then review each disputed document to determine whether the attorney-client privilege has been pierced based on the applicability of the crime-fraud exception. The parties are given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege. Haines, 975 F.2d at 97.

C.   Elements of a Claim Under Section 10(b) of the Exchange Act of 1934 and Rule 10b-5

Under the first prong, the relevant inquiry is whether Teo committed or intended to commit a fraud in violation of the anti-fraud provisions of section 10(b) and Rule 10b-5 thereunder. Indeed, no crime has been allegedly committed. (See SEC 12/9/08 ltr bf at 3-7; Def. 12/9/08 ltr bf at 2-4). At issue is whether Teo and the Trust violated section 10(b) and Rule 10b-5 by not reporting Teo's allegedly continued beneficial ownership over the Trust's shares on their respective Schedules 13D and amendments thereto beginning in July 1998.

Section 10 of the Exchange Act, provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5, which is promulgated under the authority of this provision of the

Exchange Act, provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "Section 10(b) was designed to protect investors engaged in the purchase and sale of securities by implementing a policy of full disclosure." Bilzerian, 926 F.2d at 1297. See Sante Fe Industries, Inc. v. Green, 430 U.S. 462, 473-74 (1977).

As noted above, section 13(d) and Rule 13d-2 thereunder require an investor to amend a filed Schedule 13D when there are material changes or developments.  The purpose of section 13(d) is to "alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." GAF Corp. V. Milstein, 453 F.2d 709, 720 (2d Cir. 1971), cert. denied, 406 U.S. 910 (1972).

A beneficial owner's duty to file a Schedule 13D and amendments thereto under section 13(d)'s reporting requirements creates a duty to file truthful and complete documents. SEC v. Savoy Industries, 587 F.2d 1149, 1165 (D.C. Cir. 1978), cert. denied, 440 U.S. 913 (1979); GAF, 453 F.2d at 720.  "[A] false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of § 10(b)." Bilzerian, 926 F.2d at 1298; accord GAF, 453 F.2d at 720.

To prove a violation of section 10(b) and Rule 10b-5, the SEC must show: (1) that

14

Defendants made a material misrepresentation, (2) in connection with the purchase or sale of securities, and (3) Defendants acted with scienter. SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 519 (D.N.J. 1999). Unlike a plaintiff bringing a private right of action, the SEC need not prove reliance or damages in an enforcement action. Berckeley Investment Group, Ltd. v. Colkitt, 455 F.3d 195, 208 n.16 (3d Cir. 2006). See Geman v. SEC, 334 F.3d 1183, 1191-92 (10th Cir. 2003); SEC v. Rana Research, 8 F.3d 1358, 1363-64 (9th Cir. 1993); In re Intelligroup Securities Litigation, 527 F. Supp.2d 262, 292 n.11 (D.N.J. 2007).

As to materiality, a misstatement or omission on a Schedule 13D is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." Bilzerian, 926 F.2d at 1298 (finding that "the fact that the information is required to be revealed [on a Schedule 13D] under § 13(d) is evidence of its materiality.") (citing TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Scienter is defined as "'a mental state embracing intent to deceive, manipulate, or defraud.'" Dirks v. SEC, 463 U.S. 646, 663 n.23 (1983) (internal quotation omitted). To prove scienter, the SEC must demonstrate that Defendants lacked "a genuine belief that the information disclosed was accurate and complete in all material respects." In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989) (quoting McLean v. Alexander, 559 F.2d 1190, 1998 (3d Cir. 1979)).

Additionally, scienter may be proven by circumstantial evidence, which is often the only "means of proving bad faith." McLean, 559 F.2d at 1998. The Third Circuit has recognized that a defendant's recklessness satisfies the scienter element of section 10(b) and Rule 10b-5. In re Phillips Petroleum Sec. Litig., 881 F.2d at 1244 (citing Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 649 (3d Cir. 1980)). Recklessness has been defined as:

> 'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must be aware of it.'

Healey, 616 F.2d at 649 (quoting Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875 (1977)).

### D.      December 11, 2008 Hearing: The SEC's Prima Facie Showing

On December 11, 2008, the Court conducted a hearing to address whether the SEC had made a prima facie showing of the crime-fraud exception.   For the reasons set forth on the record, the Court found that the government had established its prima facie case: (1) Teo committed or intended to commit a fraud; and (2) his communications with McKeon were in furtherance of that fraud.

### 1.      Prong One: The Fraud

This Court found that the evidence established the presence of a material 10b-5 intentional misrepresentation, after October 1998 when Teo began trading again on behalf of the Trust, despite his public divestment of all beneficial ownership in April 1998. The Court further found evidence that a reasonable basis exists to suggest the fraud may have occurred as early as July 1998.  Indeed, in his filed July 30, 1998 Amendment, Teo did not reflect his continued trading and voting authority over the Trust's Musicland stock.

### (a)      *Materiality*

The Court found the misrepresentations on the SEC public filings were material to Musicland, Teo and the investing public given the communications between Musicland, McKeon and Teo about Teo's encroachment of the poison pill threshold and his need to file accurate truthful Schedules 13D and amendments.  (See 12/11/08 Trans. at 61:23-25 - 62:1-6).  The true extent of Defendants' Musicland stock holdings affected their reporting obligations to the SEC. Defendants'

16

failure to accurately report their holdings on Schedules 13D and amendments and disclose Teo's continued beneficial ownership was material. By failing to truthfully report, Teo could purchase more than 17.5% of Musicland's stock without approaching the poison pill threshold.

Furthermore, Defendants' omissions and misstatements on their SEC filings affected Musicland's consideration of whether to trigger the poison pill - a significant corporate event. To suggest that the misstatements and/or omissions are not material is to ignore the whole course of dealings between Musicland representatives, McKeon and Teo over a three-year period. See Bilzerian, 926 F.2d at 1299 (finding "[i]t was reasonable for the jury to find that defendant engaged in a fraudulent scheme to avoid the disclosure requirements of § 13(d).")

     (b)    *"In Connection With The Purchase Or Sale Of Securities"*

As noted during the hearing, there is no dispute that the misrepresentations were in connection with the purchase or sale of securities. (See 12/11/08 Trans. at 62:6-9).

     (c)    *Scienter*

Defendants argue that the SEC cannot demonstrate "scienter." Specifically, they contend that the July 30, 1998 Amendment was accurate because, at the time, Teo had not resumed trading on behalf of the Trust. The fact that Teo did not trade again until October 1998 suggests that he had no fraudulent intent when the July 1998 Amendment was filed. This Court disagrees.

Teo, an experienced investor, disclaimed publicly his trading and voting authority over the Trust in April 1998. On July 22, 1998, Chaikin warned McKeon that Teo was approaching the poison pill threshold. In response, McKeon explained he was unaware that Teo purchased additional shares. (See Murray Decl., Exh. 11). By his own admissions, Teo was aware of the poison pill and how it could be invoked. (See id. at Exh. 6 at 88:2-21; Exh. 29 at 62:2-19). On July 30, 1998,

McKeon filed Teo's Schedule 13D Amendment, omitting the Trust's holdings because Teo no longer purportedly had investment authority for the Trust. (See id. at Exh. 12). On his September 3, 1998 Amendment, Teo did not disclose that he had beneficial ownership over the Trust. (See id. at Exh. 18). Yet, beginning October 23, 1998, Teo resumed trading on behalf of the Trust. (See id. at Exh. 20).

Despite divesting all beneficial ownership, Teo testified, in 2001, that he <u>always</u> maintained trading authority over the Trust. (See id. at Exh. 6 at 77:19-20, 79:7-12, 157:11-21, and Exh. 14 at 529:13-25 - 531:1-11). Additionally, during the criminal trial, ███████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████Thus, it seems implausible that an experienced investor like Teo would not know that trading for the Trust would be considered fraudulent activity after his trading authority had been revoked in April 1998.

Furthermore, proffered evidence suggests that Teo continued to mislead Musicland through his communications directly with company executives. For example, in a January 2000 letter to Jack Eugster, Musicland's Chairman and CEO ("Eugster"), Teo stated that "I am very close to the 17.5% cap set by the 'Poison Pill.'" (See id. at Exh. at 24). In the letter, Teo did not disclose that he was still exercising trading and voting authority over the Trust.

When viewed together, those series of events create a fair inference that Teo had no intent to abide by the revocation of authorization in April 1998.[8] Rather, the evidence suggests that Teo

---

[8] During oral argument, Defendants urged this Court to find that reliance is a necessary element to establish a prima facie showing of a 10b-5 violation. Defendants suggested that this Court undertake a common law fraud analysis based on notions of fairness and policy, requiring the SEC to prove fraud by establishing additional elements of reliance and damages. (See 12/11/08 Trans. at 32:18-25, 34:6-16). Defendants asserted that the evidence produced during

used the SEC filings, beginning in July 1998, together with the co-trustees' revocations of his trading

and voting authority in April 1998, to fraudulently conceal his continued beneficial ownership and

control of the Trust's Musicland stock.  (See id. at Exhs. 18-20, 26).  As such, based on the

aggregation of the SEC's proffered evidence, this Court was satisfied that, while Teo publicly

disavowed beneficial ownership over the Trust, he actually intended to maintain his trading

authority.  Accordingly, there is prima facie evidence that Teo possessed an intent to commit a fraud.

### 2.   Prong Two:  Communications Were In Furtherance of the Fraud

As to this inquiry, the Court must undertake a more subtle analysis.  In re: Grand Jury

Investigation, 445 F.3d at 276.  Nonetheless, for the reasons set forth on the record, the Court found

the SEC had made a prima facie showing that Teo's communications with McKeon were in

_____

the criminal trial proves there was no reliance because Musicland executives were aware of Teo's
beneficial ownership over the Trust even after the July 30, 1998 Amendment.

At the hearing, this Court rejected Defendants' arguments because neither the anti-fraud
provisions at issue nor case law support Defendants' contention.  Indeed, in Herman & MacLean
v. Huddleston, 459 U.S. 375 (1983), the Supreme Court drew distinctions between the securities
laws and common law fraud principles.  The Supreme Court noted that "the antifraud provisions
of the securities law are not coextensive with common law doctrines of fraud.  Indeed, an
important purpose of the federal securities statutes was to rectify perceived deficiencies in the
available common law protections by establishing higher standards of conduct in the securities
industry."  Id. at 388-89.  See Geman, 334 F.3d at 1191.

In any event, the Court independently found reliance here by Musicland and the public.
In so finding, the Court highlighted evidence that Musicland executives believed Teo was no
longer a beneficial owner of the Trust. (See Murray Decl., Exh. 22 at 51:11-16 52:17-21, 52:22-
23; Exh. 40 at 40:14-18, 41:19-22, 42:2-8).  Additionally, in a February 4, 1999 internal email
between Musicland executives and in-house counsel, it was reported that Musicland had "no way
of showing any collusion between the trust and Alfred Teo.  If there is, he may already be in
violation of the securities laws." (Id. at Exh. 23).  This evidence is consistent with Teo's own
testimony, in which he denied telling Musicland's management, after the July 1998 Amendment
filing, that he still had trading authority for the Trust. (Murray Decl., Exh. 6 at 91:8-20, 155:21-
25; Exh.14 at 546:3-5; Exhs. 27-28).

furtherance of the securities fraud.

First, McKeon represented Teo and the Trust on several legal matters, including the creation of the Trust for benefit of Teo's four sons in 1992, as well as the preparation and filing of all the SEC filings from 1997 through 2000 at issue. As such, Teo continuously consulted with McKeon regarding his beneficial ownership status over the Trust, the April 1998 revocations of authorization, and Teo's post-decoupling SEC filing obligations.

Second, McKeon served as the conduit between Musicland's executives and Teo regarding, among other things, Teo's SEC disclosure obligations; Teo's additional purchase of Musicland stock; and Teo's stock ownership as it approached the poison pill threshold. Third, McKeon advised Teo that increasing ownership of Musicland shares would trigger SEC disclosure requirements and/or Musicland's poison pill. (See Murray Decl., Exhs. 9-11). Finally, Teo misused McKeon's services to file inaccurate SEC public filings and mislead Musicland by claiming Teo need not report the Trust on his July 30, 1998 Amendment, following the April 1998 decoupling.

Indeed, but for McKeon filing the false SEC forms containing material misstatements and omissions, and relaying false information to Musicland, Teo would not have been able to engage in his allegedly fraudulent scheme. The SEC need not show that the intended fraud was accomplished, "only that the lawyer's advice or other services were misused." In re: Grand Jury Investigations, 445 F.3d at 279 n.4. Accordingly, this Court is satisfied that the SEC made a prima facie showing that Teo had the intent to commit a fraud through the materially false and misleading statements and omissions in his SEC filings, and that he was communicating with McKeon and misusing his services in furtherance thereof.

Defendants' reliance on United States v. Bauer, 132 F.3d 504 (9th Cir. 1997), is misplaced.

In Bauer, the Ninth Circuit found that the attorney gave advice which the client/defendant ignored. Id. at 509-10. Accordingly, the court found that no "casual connection or functional relationship exists between the advice given" by the attorney and the defendant's actions. Id. at 510. Therefore, the court held that these communications did not fall within the crime-fraud exception. Id.

While it is true that mere relation between the advice and the client's actions is not sufficient to invoke the crime-fraud exception, here, there is adequate evidence that Teo intended to misuse the information he received from McKeon to further his fraudulent scheme. Thus, the crime-fraud exception is triggered.

The Court's findings are not based merely on McKeon's advice to Teo (i.e., Teo can no longer have anything to do with the Trust). Indeed, as set forth above, McKeon filed fraudulent forms with the SEC beginning in July 1998. These fraudulent filings allowed Teo to fly under the radar and resume trading six months later on behalf of the Trust in October 1998. Thus, there is temporal proximity sufficient to establish a prima facie showing. See In re Grand Jury Investigation, 445 F.3d at 279 (Third Circuit noting that "the temporal proximity of the ongoing deletion of emails after January 20 could be viewed as an additional indication that Jane Doe intended to use the information she gathered from the January 20 communication to further the scheme to obstruct.")

E.    March 5, 2009 Evidentiary Hearing To Rebut The SEC's Evidence

On March 5, 2009, guided by Haines and In re: Grand Jury investigation, this Court conducted an evidentiary hearing.

The Court considered evidence, including the communications and documents themselves, "if believed by the fact finder[,] would be sufficient to support a finding that the elements of the crime-fraud exception were met." Haines, 975 F.2d at 95-96. To comply with the guidance set forth

21

in Haines, the Court conducted the hearing in three stages.

First, the SEC and Defendants were present in the courtroom for the presentation of nonprivileged evidence. Next, the SEC was excused from the courtroom, and Defendants were given an opportunity to rebut ex parte the SEC's evidence, with their own evidence and argument. During this phase of the hearing, Defendants presented documents that they wished to shield from disclosure, relying on the documents themselves, and in part, on testimony from McKeon. Each document is listed on a privilege log, which is attached to the SEC's March 2, 2009, letter brief ("privilege log"). If Defendants could satisfactorily explain the apparent fraudulent purpose, then the attorney-client privilege would be withheld. See Haines, 975 F.2d at 96-97; see also In re Feldberg, 862 F.2d 622, 626 (7th Cir. 1988). This phase of the hearing was sealed by the Court.

The Court reserved judgment on several documents presented by Defendants during the sealed portion of the hearing. During the final phase of the hearing, the Court afforded the SEC an opportunity to make proffers concerning some of these documents. The Court's rulings on the balance of these documents are incorporated herein.

At the start of the hearing, the Court held that the attorney-client privilege applies to drafts of public filings identified on the privilege log. Acknowledging a split of authority on the issue, compare Louisana Municipal Police Employees Retirement System, 253 F.R.D. 300, 314-15 (D.N.J. 2008), and Schenet v. Anderson, 678 F. Supp. 1280 (E.D. Mich. 1988), with In re Grand Jury Proceedings, Thursday Special Grand Jury Term, 1991, 33 F.3d 342 (4th Cir. 1994), the Court noted that the Third Circuit had not spoken directly on this issue. However, its guidance in United States v. Moscony, 927 F.2d 742 (3d Cir. 1991), is instructive: "'[i]t is generally true that 'if the client intended the matter to be made public, the requisite confidentiality is lacking. For example,

22

information communicated by a client which he knew would be disclosed in legal documents . . . is outside the privilege.'" Id. at 752 (internal quotation omitted).

District courts within the Third Circuit have found that the attorney-client privilege applies to drafts. See, e.g., Southeastern Pennsylvania Transp. Auth. v. Caremarkpcs Health, L.P., 254 F.R.D. 253, 258 (E.D. Pa. 2008); In re U.S. Healthcare, Inc. Securities Litig., No. 88-0559, 1989 WL 11068, * 2 (E.D. Pa. Feb. 8, 1989). Thus, this Court concluded that any information contained in draft documents communicated between an attorney and his/her client, which were not revealed ultimately in a public filing, is protected by the attorney-client privilege. Accordingly, the Court emphasized that any allegedly privileged drafts of SEC filings would be subject to the same crime-fraud exception analysis under Haines as any other category of privileged documents.

Notwithstanding the Court's ruling on drafts of public filings, Defendants represented that they would voluntarily produce many documents, including drafts of SEC filings and correspondence between McKeon and Teo in connection therewith. Defendants further announced that they would voluntarily produce certain documents listed on their privilege log to the SEC, conceding the documents are not privileged. Both categories of documents have been identified as follows:

> Bates nos. PJMCK 0001-0026, 0027, 0028-0029, 0030-0045, 0046-0060, 0064,0065-0074, 0075-0076, 0079, 0080-0095, 0125-0149, 0150, 0202, 0205-0213, 0263-0280, 0294-0296, 0302-0318, 0319, 0322, 0371, 0409, 0466-0473, 0474, 0475, 0476-0477

Next, Defendants agreed to voluntarily produced the following documents:

> Bates nos. PJMCK 0096-0124,[9] 0224, 0301, 0368, 0373-0389/Murray

---

[9] During the ex parte portion of the hearing, defense counsel represented that they would voluntarily produce PJMCK 0096-0124, an August 15, 1997 draft amendment to a Schedule 13D, but requested the handwritten notes of McKeon appearing on PJMCK 0108 be redacted. Defense counsel argued that the notes on PJMCK 0108 were not ultimately disclosed on the final

Decl., Exh. 34, 0392/Murray Decl., Exh. 36, 0429-0440, and 0443-0451. (See 3/5/09 Sealed Trans., at 23:3-10; 34:19-25 - 35:1-10; 58:4-14; 59:3-5; 63:22-25 - 64:1-8, 21-25, 65:1-15; 65:17-25 - 66:1-16; 87:1-10; 89:1-11).

Defendants also agreed to produce several documents, subject to specific redactions of allegedly privileged communications.  The Court granted Defendants' request for redaction, and ordered the following documents produced:

1.   PJMCK 0153-0177 (except redact the copy of the post-it handwritten notes dated August 22, 1997 on the middle of PJMCK 0153 as privileged). (See 3/5/09 Sealed Trans., at 17:16-19, 18:5-25 - 19:1-6).

2. PJMCK 0325-0326 (but redact the facsimile header consistent with this Court's oral rulings).  (See 3/5/09 Sealed Trans., at 39:15-22, 40:9-11).

3. PJMCK 0327-0345 (but redact the entire first paragraph under Item 4 on PJMCK 0338 consistent with this Court's oral rulings). (See 3/5/09 Sealed Trans., at 43:5-22 - 44:1-3).

4. PJMCK 0393 (but redact the text in the middle of the fourth paragraph, documenting conversations between McKeon and Teo, which is consistent with this Court's oral rulings). (See 3/5/09 Sealed Trans., at 67:3-25 - 68:1-16).

5. PJMCK 0395-0400 (but redact the facsimile header and footer consistent with this Court's oral rulings). (See 3/5/09 Sealed Trans., at 69:9-25 - 70:1-2, 15-19).

6.   PJMCK 0406 (but redact the facsimile header and footer consistent with this Court's oral rulings). (See 3/5/09 Sealed Trans., at 77:16-22).

7.   PJMCK 0408 (but redact the facsimile header and footer consistent with this Court's oral rulings). (See 3/5/09 Sealed Trans.,

---

amendment to the Schedule 13D that was filed with the SEC, and thus, should be redacted. (See March 5, 2009, Sealed Hearing Trans., Vol. 2 ("3/5/09 Sealed Trans.") at 7:22-25 - 6, 9:2-25, 10:15-17). As discussed below, this Court rejected Defendants' redaction argument and instead ordered PJMCK 0108 to be produced in its entirety to the SEC.

at 77:23-25 - 78:1-2).

8. PJMCK 0459-0465 (but redact the facsimile header and footer consistent with this Court's oral rulings). (<u>See</u> 3/5/09 Sealed Trans., at 94:20-25 - 95:1-9).

The hearing next focused on six general categories of documents.[10]

      1.    *Documents Reflecting Communications Between Teo And His Attorneys*

This category of disputed documents involves communications between McKeon and Teo; McKeon and agents and/or beneficiaries of the Trust; or between Teo and Neil Golden, Teo's prior attorney ("Golden"). These documents are as follows:



1. PJMCK 0061

2. PJMCK 0062-0063

3. PJMCK 0077

    4. The second entry appearing on bates no. PJMCK 0152,

---

[10] As discussed in more detail herein, the Court considered Exhibits 32-39 as part of the sixth category of documents on which the Court reserved judgment. As such, this Opinion includes the Court's rulings on the following documents: (1) PJMCK 0351/Murray Decl., Exh. 38; (2) PJMCK 0352-0353/Murray Decl., Exh. 33; (3) PJMCK 0354-0356/Murray Decl., Exh. 32; and (4) PJMCK 0390-0391/Murray Decl., Exh. 36.



5. PJMCK 0201

6. PJMCK 0214-0216

7. PJMCK 0217-223

8. PJMCK 0281

9. PJMCK 0287 and 0288

10. PJMCK 0289-0293

11. PJMCK 0300

---

[11] During the *ex parte* portion of the hearing, the Court advised defense counsel that it would reserve judgment on PJMCK 0297-0299 to allow the SEC to argue its entitlement to such documents during the subsequent unsealed portion of the hearing.

26



12.   PJMCK 0323,

13.   PJMCK 0324

14.   PJMCK 0346,

15.   PJMCK 0347

16.   PJMCK 0363-0364

PJMCK 0366-0367 are identical copies of bates nos. PJMCK 0363-0364.

17.   PJMCK 0394

18.   PJMCK 0405

19.   PJMCK 0495-0496,

With the exception of PJMCK 0283-0286, the Court found that these documents reflect privileged communications between McKeon and Teo or between McKeon and Golden as Teo's attorneys. The communications pertain to legal advice in connection with Defendants' holdings of

stock and requisite SEC forms to be filed. Moreover, several of these documents predate the alleged initial false SEC filing (<u>i.e.</u>, the July 30, 1998 Amendment).[12]   Thus, as to this category of documents, the Court finds that the communications are temporally remote on their face from the alleged fraud, and therefore, were not made "in furtherance of the fraud."

Morever, all but three of these documents predate the April 1998, revocation of Teo's investment authority over the Trust. Furthermore, even if a temporal connection existed, based on the content of all these documents, the Court is satisfied that the documents contain nothing that would create a logical nexus between the communications and Teo's subsequent actions. In short, the communications do not show that Teo intended to commit a fraud or that these communications were in furtherance of any fraud. (<u>See</u> Murray Decl., Exhs. 7 & 8).

As to PJMCK 0283-0286, defense counsel admitted that these documents are not privileged because they are communications between McKeon and Chaikin.  The Court ruled that these documents should be produced because they do not contain privileged communications. (<u>See</u> 3/5/09 Sealed Trans., at 26:6-15; 27:24-25 - 28:1-17; 28:20-25 - 29:1-18).

Accordingly, for the reasons set forth on the record, this Court is satisfied that Defendants' explanation is sufficient to refute any application of the crime-fraud exception to this category of documents. For similar reasons, the Court ruled that Defendants could redact the handwritten post-it, dated August 22, 1997, on the middle of PJMCK 0153, because it reflects privileged communications between McKeon and Teo ███████████████████████████████

████████████████████████████████

---

[12] The SEC does not allege that the February 1997 or the November 1997 Schedules 13D were inaccurate or fraudulent.

2. *Documents About Which McKeon Possessed No Independent Recollection*

McKeon testified about documents for which he had no independent recollection about the author, recipient, and/or nature of the communications. These documents are as follows:



1. PJMCK 0108

2. PJMCK 0151,

3. PJMCK 0178-0200,

4. PJMCK 0203-0204,

5. PJMCK 0225-0244,

6. PJMCK 0372 (except five lines of ████ handwritten notes that appear half way down the page of PJMCK 0372; the court reserved judgment on these five lines). (See 3/5/09 Sealed Trans., at 64:21-24).

7. PJMCK 0348,

8. PJMCK 0478,

For the reasons set forth on the record, this Court is satisfied that Defendants cannot make a sufficient evidentiary showing to establish that these documents are privileged communications between McKeon and Teo. Indeed, at the hearing, McKeon himself testified that he had no independent recollection about these communications. Accordingly, the Court orders the documents

to be produced.  (See 3/5/09 Sealed Trans., at 13:4-24, 14:8-12, 15:15-17, 19:13-21, 21:8-15, 23:24-25 - 24:1-6, 45:24-25, 46:11-25, 96:13-17).[13]

### 3. Documents That Relate to McKeon's Communications With Third Parties

Defendants next presented evidence that the following documents reflected privileged communications between McKeon and Teo: bates nos. PJMCK 0152, 0245-0262, 0482-0483, 0484-0488, and 0490-0494.  However, based on the representations made by McKeon's counsel and McKeon at the hearing, this Court is satisfied that, with one exception on PJMCK 0152, these documents do not reflect communications between McKeon and Teo or representatives of the Trust.  Indeed, some of the communications are between McKeon and Teo's broker, and plainly not privileged.  (See 3/5/09 Sealed Trans., at 24:7, 25:6-11; 102:13-25 - 103:1-25 - 104:1-9, 106:25 - 107:1-14).

Moreover, some of the documents do not reflect communications at all.  For example, ████████████ PJMCK 0482-0483 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████ (See 3/5/09 Sealed Trans., at 101:8-22, 102:1-11).

As to PJMCK 0152, this Court ordered Defendants to produce only ██████ handwritten note entries dated, August 21, 1997, and August 26, 1997, respectively.  Yet, the Court found that the second entry dated August 25, 1997 was privileged because it reflects communications between

---

[13] Defense counsel does not concede, and the Court does not rule, that the attorney-client privilege has been pierced as to these documents.  Thus, there are no findings that the crime-fraud exception applies, or that Defendants have waived any argument preserving the privilege. (See 3/5/09 Trans., Vol. 2 at 13:4-24, 14:14-25 - 15:1-15).

McKeon and Teo in connection with legal advice sought. Additionally, the content of this note entry does not demonstrate any intent to commit fraud nor was it made in furtherance thereof. Thus, on PJMCK 0152, this latter portion only should be redacted. (See 3/5/09 Sealed Trans., at 16:2-25 - 17:1-10).

The Court next considers PJMCK 0401, ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ (See 3/5/09 Sealed Trans., at 71:2-9). Therefore, this Court is satisfied that PJMCK 0401 is not a privileged communication.

Accordingly, for the reasons set forth on the record, this Court is satisfied that Defendants cannot make a sufficient evidentiary showing to establish that any of these documents, except for the second entry of McKeon's notes on PJMCK 0152 dated August 25, 1997, are communications between McKeon and Teo. Thus, this category of documents is not protected by the attorney-client privilege, and they are hereby ordered produced.

4.    *Non-Privileged Documents That Disclose The Existence of Communications Between Teo and McKeon*

Defendants acknowledged that several UPS mailing labels ███████████████████

and a ██████████ facsimile cover sheet, do not themselves contain privileged communications between Teo and McKeon. However, Defendants argued that these documents reveal that some privileged communications had taken place. This Court rejected Defendants' argument, noting that Defendants identified these documents on their privilege log. Accordingly, this Court finds that Defendants have waived their right to assert that the attorney-client privilege protects such

documents. The Court orders Defendants to produce ███████████████████████

██████████████ PJMCK 0224, 0365, 0370, as well as ███████████████████████

██ PJMCK 0369. (See 3/5/09 Sealed Trans., at 23:3-10, 57:5-25 - 58:1-3).

       5.    *Documents Pertaining to Defendants' Ownership of*
           *Cirrus Logic Stock*

During the ex parte portion of the hearing, defense counsel proffered that several documents

████████████████████████████████████████████ reflected are privileged

communications between McKeon and Teo. Those documents are bates nos. 0297-0299, 0320-0321,

0349-0350, and 0402-0404. The Court reserved judgment on whether the privilege protects such

documents, until the SEC was given an opportunity to explain the relevancy of these documents

sought in its subpoena.

During the unsealed portion of the hearing, the SEC conceded that it was not claiming, here,

that the SEC filings concerning Defendants' ownership of Cirrus Logic stock were fraudulent.

Rather, the SEC was arguing that Defendants' ownership of Cirrus Logic stock relate to the insider

trading component of this case. Specifically, Teo, who was on Cirrus Logic's Board of Directors,

learned of a potential acquisition of an unrelated company. Teo, in turn, conveyed this insider

information to others, including Mitchell Sacks, another defendant in this case. However, the SEC

asserted that allegedly privileged documents "may be tangentially" related to the SEC's fraudulent

Schedules 13D claim vis-a-vis Defendants' Musicland stock holdings. According to the SEC, Teo's

Schedules 13D reporting Cirrus Logic stock are relevant to show his general knowledge of poison

pills because Cirrus Logic had adopted a poison pill in 1999.

This Court is satisfied that these documents are not subject to the crime-fraud exception. The

proper inquiry is whether these particular documents demonstrate Teo's intent to commit a fraud, and the communication is in furtherance of that fraud. This Court is satisfied that the SEC cannot make such a showing. Accordingly, PJMCK 0297-0299 shall not be produced. (See 3/5/09 Trans., Vol. 3 at 12:5-25, 13:3-7).

For the same reasons, the Court ruled that PJMCK 0320-0321 and 0349-0350 are privileged, are not in furtherance of any fraud. (See id. at 13:3-13). Finally, for the reasons set forth on the record, this Court is satisfied that PJMCK 0402-0404 are privileged communications that neither show any intent to commit a fraud nor are in furtherance of the alleged fraudulent scheme. Therefore, the crime-fraud exception does not pierce these communications. Thus, the Court will not order these documents to be produced.

6.    *Documents On Which This Court Reserved Judgment*

During the hearing, Defendants asserted that several documents, as described in detail below, were privileged, and presented ex parte supporting evidence. At the time of the hearing, it was not apparent whether these documents should be analyzed under the crime-fraud exception or under doctrines of waiver and/or collateral estoppel. The Court reserved on those documents. This written opinion reflects the Court's rulings concerning them.

(a)    *PJMCK 0351/Murray Decl., Exh. 38*



PJMCK 0351 reflects handwritten notes (See 3/5/09 Sealed Trans., at 48:1-4). (See id. at 50:3-6). Based on the Court's review of the document, McKeon's testimony, and Defendants' proffer, this Court finds

that PJMCK 0351 reflects privileged attorney-client communications, relating to legal advice ▮▮▮

▮▮▮▮▮▮▮

Furthermore, although the document is dated ▮▮▮▮▮▮ after Teo's April 1998 revocation

of authorization vis-a-vis Musicland shares owned by the Trust, the document refers to ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. During the unsealed portion of the hearing, the SEC conceded that

this application does not involve any allegations of fraud concerning Defendants' SEC filings of their

Cirrus Logic stock ownership. Thus, this Court is satisfied that PJMCK 0351 does not evidence any

intent by Teo to commit a 10b-5 violation, or demonstrate that his communication with McKeon was

in furtherance of any such fraud. Accordingly, Defendants have sufficiently rebutted the SEC's

prima facie evidence that PJMCK 0351, a privileged communication, falls within the crime-fraud

exception.

However, as will be discussed in "subsection G" below, the Court finds that Defendants have

waived their right to assert the protection of the privilege with regards to PJMCK 0351, which has

been identified as Murray Decl., Exh. 38. Accordingly, the Court orders PJMCK 0351/Murray

Decl., Exh. 38, be produced.

      (b)     *PJMCK 0352-0353/Murray Decl., Exh. 33*

PJMCK 0352-0353 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. PJMCK 0352, ▮▮▮▮▮

▮▮▮▮ clearly reflects a communication between counsel and client. Yet, based on the record

before the Court, it is not apparent that the document is an otherwise privileged communication.

Indeed, Defendants offered no evidence suggesting that PJMCK 0352 relates to a fact of which

McKeon was informed by Teo, let alone in confidence for the purpose of securing legal advice.

34



In sum, ████████ PJMCK 0352-0353, ████████████████████

███████████████████████████████████████████████████████

████████ Without more evidence, the Court cannot conclude that this attorney-client communication was prepared at the direction of Teo and/or in confidence, and thus, is not clearly privileged. Therefore, the Court orders PJMCK 0352-0353 produced.

Even if this Court were to find that these documents are protected by the privilege, this Court concludes that Defendants have not proffered sufficient evidence to rebut the SEC's prima facie showing that the crime-fraud exception applies to PJMCK 0352-0353. Undisputedly, these documents predate the July 30, 1998 Amendment. However, based on the totality of circumstances, this Court is satisfied that they demonstrate Teo's intent to commit a 10b-5 violation and the communications were in furtherance thereof. Teo, an experienced investor, decided to disclaim his investment authority over the Trust in April 1998. Yet, within six months, in October 1998, Teo was trading again on behalf of the Trust. This time frame is crucial because it evidences Teo's plan in

35

April 1998 to devise a fraudulent scheme to conceal his true beneficial ownership of the Trust's Musicland stock.

Furthermore, McKeon was the direct contact between Musicland's executives and Teo regarding, among other things, Teo's SEC disclosure obligations and the method of decoupling as an option to avoid triggering the poison pill. As noted previously, McKeon advised Teo that increased ownership of Teo's Musicland shares would trigger SEC disclosure requirements and/or Musicland's poison pill. Accordingly, an inference can be drawn that Teo misused McKeon's legal advice and/or services in furtherance of his fraud, by publicly disclaiming his trading authority over the Trust, but then subsequently trading again on behalf of the Trust six months later.

In any event, as will be discussed in "subsection G" below, the Court finds that Defendants have waived their right to assert the protection of the privilege with regards to PJMCK 0352-0353, which have been identified as Murray Decl., Exh. 33. Accordingly, the Court orders PJMCK 0352-0353/Murray Decl., Exh. 33, be produced.

(c)     *PJMCK 0354-0356/Murray Decl., Exh. 32*[14]

PJMCK 0354-0356 ████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████ For the same reasons this Court found PJMCK 0352 was not a privileged communication, PJMCK 0354 is likewise not a privileged communication between

---

[14] Upon careful consideration, it appears that PJMCK 0359-0361 are copies of PJMCK 0354-0356. Accordingly, this Court's findings as to PJMCK 0354-0356 apply equally to PJMCK 0359-0361.

McKeon and Teo. Thus, these documents shall be produced.[15] Furthermore, this Court similarly finds that, even if they are privileged, the documents are subject to the crime-fraud exception.

In any event, as will be discussed in "subsection G" below, the Court finds that Defendants have waived their right to assert the protection of the privilege concerning PJMCK 0354-0356, which have been identified as Murray Exh. 32. Accordingly, the Court orders PJMCK 0354-0356/Murray Decl., Exh. 32, be produced.

(d)   *PJMCK 0372 (only the five lines appearing in the middle of the document)*

PJMCK 0372 contains two sets of handwritten notes. ███████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████. Defendants are not claiming this top portion of the document contains privileged communications. (See 3/5/09 Sealed Trans., at 62:6-12). Rather, Defendants submit that the five lines appearing in the middle of the document reflect privileged communications. █████████████████████████████████
that these five lines reflect McKeon's handwritten notes, ████████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████ (See id. at 64:13-20).

Based on its review of the document, the Court is satisfied that these five lines on PJMCK 0372 reflect privileged communications. ████████████████████████████████

---

[15] At oral argument, the Court ordered Defendants to produce all UPS shipping labels between McKeon and Teo. Accordingly, consistent with the Court's prior ruling as set forth on the record and herein, Defendants shall produce bates nos. PJMCK 0357, 0358, 0362. (See 3/5/09 Sealed Trans., at 23:3-10, 57:5-25 - 58:1-3).

▓▓▓▓▓▓▓▓▓▓ the communication concerned confidential information to be relayed to Teo, the client.  The fact that McKeon used his secretary as a conduit does not remove the communication from the protection of the privilege.  See United States v. Kovel, 296 F.2d 918, 921 (2d Cir. 1961).

Second, the content pertains to drafts of SEC documents to be filed.  This Court previously ruled that the drafts themselves, which contain information not ultimately disclosed to the SEC or other third parties, are protected.  See Schenet, 678 F. Supp. at 1283.  Thus, communications between counsel and client regarding such drafts are similarly protected.  Third, ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓ this Court finds this communication is temporally remote on its face from the alleged fraud.  Accordingly, the five lines appearing on the middle of PJMCK 0372 reflect communications protected by the attorney-client privilege, and thus, they are not pierced by the crime-fraud exception.

(e)   *PJMCK 0390-0391/Murray Decl., Exh. 36*

PJMCK 0390-0391 are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ Defendants do not dispute that the attached communication between Chaikin and McKeon is not privileged.  (See 3/5/09 Sealed Trans., at 65:17-25 - 66:1-14).  Based on its review of PJMCK 0390-0391, the Court is satisfied that these documents reflect privileged communications in that McKeon was attempting to give legal advice ▓▓▓▓▓▓▓ ▓▓ ▓▓▓▓▓▓▓▓▓▓

38

████████ temporal proximity alone is not sufficient to invoke the crime-fraud exception. In re Sealed Case, 107 F.3d 46, 50 (D.C. Cir. 1997); In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986). On their face, these documents by themselves do not demonstrate any intent by Teo to commit securities fraud nor do they evidence that the communications were made in furtherance of the alleged fraud. Thus, I am satisfied that the crime-fraud exception does not apply to PJMCK 0390-0391.

However, as will be discussed in "subsection G" below, the Court finds that Defendants have waived their right to assert the protection of the privilege as to PJMCK 0390-0391, which have been identified as Murray Decl., Exh. 36. Accordingly, the Court orders PJMCK 0390-0391/Murray Decl., Exh. 36, be produced.

(f)     PJMCK 0410

PJMCK 0410 ████████████████████████████████████████ ████████████████████████████████████████ ████████ (See 3/5/09 Sealed Trans., at 78:3-12). ████████████ ████████████████████████This document clearly reflects privileged communications that occurred after the July 30, 1998 Amendment. However, not every subsequent communication between McKeon and Teo concerning Defendants' ownership of Musicland shares necessary invokes the crime-fraud exception.

Yet, when viewed as part of an ongoing series of communications between McKeon and Teo about Teo's disclaimer of beneficial ownership, duty to accurately report Defendants' total number of shares owned, and avoidance of Musicland's poison pill threshold, PJMCK 0410 evidences Teo's intent to commit a fraud. ████████████████████████████████

Indeed, as he resumed trading on behalf of the Trust in October 1998, Teo was obligated to disclose his beneficial ownership to McKeon, who, in turn, should have reported this fact on subsequent Schedules 13D and amendments.

However, as PJMCK 0410 [redacted] As such, PJMCK 0410 also shows that Teo misused McKeon's services to further Teo's fraud. Therefore, the Court is satisfied that the crime-fraud exception is invoked, and PJMCK 0410 must be produced.

   (g)   *PJMCK 0411*

[redacted] the first line on the top of PJMCK 0411 reflects [redacted] handwritten note [redacted] (See 3/5/09 Sealed Trans., at 78:25 - 79:1, 9-18). [redacted] this Court is satisfied that Defendants cannot make a sufficient evidentiary showing to establish that this first line on the top of PJMCK 0411 reflects a communication between McKeon and Teo. Thus, this first line is not protected by the attorney-client privilege.[16]

_____

[16] Yet, this Court emphasizes that defense counsel does not concede, and the Court does not rule, that the attorney-client privilege has been pierced as to the top line of notes on PJMCK 0411. Thus, there are no findings that the crime-fraud exception applies, or that Defendants have waived any argument preserving the privilege.

As to the rest of the document, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (See id. at 80:7-11, 18-25).  As

noted above, McKeon's use of his secretary to communicate directly with Teo does not remove the

communication from the protection of the privilege.  See Kovel, 296 F.2d at 921.  The first seven

lines of the secretary's notes ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Based on this Court's review,

it is satisfied that the nature of these seven lines of notes reflects privileged communications between

Teo and McKeon's office.  Furthermore, the Court is satisfied that these notes do not reflect any

intent by Teo to commit a fraud nor are they in furtherance of any fraud.  Therefore, the crime-fraud

exception is not invoked, and these first seven lines of the secretary's notes on PJMCK 0411 shall

not be produced.

The Court, however, reaches a different conclusion concerning the remaining seven lines of

the secretary's notes. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (See 3/5/09 Sealed Trans.,

at 80:23-25).  Again, these notes clearly reflect a privileged communication between Teo and

McKeon's secretary.  On their face and in isolation, these notes do not evidence any intent to commit

a fraud or misuse of the communication in furtherance of the fraud.

Yet, for the same reasons this Court found the protection of PJMCK 0410 was pierced by the

crime-fraud exception, this Court determines that the last seven lines of notes on PJMCK 0411 are

subject to the exception.  When viewed as part of an ongoing series of communications between

McKeon and Teo, these seven lines of notes evidence Teo's intent to commit a fraud. ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Accordingly, these seven lines also show that Teo misused McKeon's services to further Teo's fraud. Therefore, the Court is satisfied that the crime-fraud exception is invoked, and the remaining seven lines of the secretary's notes on PJMCK 0411 shall be produced.

In any event, this Court finds that consistent with <u>Schenet</u>, Defendants have waived the privilege as to the first six of the last seven lines of notes on PJMCK 0411. The court in <u>Schenet</u> held that "[t]he privilege is waived only as to those portions of preliminary drafts ultimately revealed to third-parties." <u>Schenet</u>, 678 F. Supp. at 1283-84. As the filed May 10, 1999 Amendment reveals, the information contained in these six lines on PJMCK 0411 were ultimately included in the filing with the SEC. (<u>See</u> Murray Decl., at Exh. 19).

     *(h)*    *PJMCK 0412-0425*

PJMCK 0412 and PJMCK 0413 ████████████████████████████████████████ ████████████████████████████. For the reasons expressed by this Court in its discussion of PJMCK 0390-0391, I am satisfied that the crime-fraud exception does not apply to PJMCK 0412-0413, and thus these documents shall not be produced.

As to PJMCK 0414-0425, all of the handwritten revisions on PJMCK 0415, 0416, 0417, 0420, and 0423, except for those appearing on PJMCK 0419, and the first line of typed text appearing on PJMCK 0420, were ultimately disclosed on the filed version of Teo's May 10, 1999 Amendment. (<u>See</u> Murray Decl., Exh. 19). Accordingly, consistent with <u>Schenet</u>, this Court is satisfied that PJMCK 0414-0425 should be produced. However, as the revisions appearing on PJMCK 0419 and the first line of typed text appearing on PJMCK 0420 were not contained in the

filed May 10,1999 Schedule 13D, the Court orders these revisions, which clearly reflect privileged communications, be redacted on those two pages.

(i)     *PJMCK 0426-0428*



PJMCK 0426 is a facsimile cover sheet ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ attaching a letter ▓▓▓▓▓▓▓▓▓▓▓▓ (PJMCK 0427-0428), ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (PJMCK 0429-0440).[17] ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓ letter (PJMCK 0428), ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ PJMCK 0428 also contains two entries of McKeon's secretary's handwritten notes ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (See 3/5/09 Sealed Trans., at 86:10-21).

For the reasons expressed by this Court in its foregoing discussion of PJMCK 0390-0391 and PJMCK 0412-0413, I am satisfied that the crime-fraud exception does not apply to PJMCK 0426, and thus shall not be produced. As to PJMCK 0427-0428, on its face, ▓▓▓▓▓▓▓ letter clearly reflects privileged communications between McKeon and Teo. However, for the same reasons this Court found the crime-fraud exception applies to PJMCK 0410 and the last seven lines of handwritten notes on PJMCK 0411, this Court finds that PJMCK 0427-0428 are subject to the exception. Accordingly, the Court orders them to be produced.

In any event, this Court finds that, consistent with <u>Schenet</u>, Defendants have waived the privilege as to the narrative information and reported numbers and percentage of shares referenced in item numbers 2 and 3 on PJMCK 0427 and 0428. Indeed, this information was ultimately

---

[17] As previously discussed, during the <u>ex parte</u> portion of the March 5, 2009, evidentiary hearing, Defendants agreed to produce PJMCK 0429-0440.

included in the May 10, 1999 Schedule 13D amendment that was filed with the SEC. (See Murray
Decl., at Exh. 19).

     *(j)*     *PJMCK 0441-0442*

     PJMCK 0441 and 0442 are identical letters ███████████████████████████████

except that PJMCK 0441 bears one line consisting of a handwritten note ██████████████████████

███████. (See 3/5/09 Sealed Trans., at 87:15-16).  The handwritten note reflects a communication

between Teo and McKeon ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████Thus, when PJMCK 0441-0442 is viewed with

PJMCK 0443, the former demonstrates Teo's intent to commit the fraud and that his

communications with McKeon were used in furtherance thereof.   Therefore, the Court orders

PJMCK 0441-0442 be produced.

     *(k)*     *PJMCK 0452-0456*

     PJMCK 0452 appears to be a handwritten note, ████████████████████seeking legal

advice ██████████████████████████████████████ PJMCK 0453 is a letter

from Teo's broker, Buzz Paterson, ██████████████████████████████████████████

████████████████████ PJMCK 0454-0456 appear to be ledgers, ████████████████████████

█████████████████████████████The Court considers all of these related documents together.

█████████████████████████████████████████████████████████████████████████████

██████████████████████████████ (See 3/5/09 Sealed Trans., at 92:9-12). Based on

this Court's review of the documents, it is satisfied that PJMCK 0452 reflects privileged

communications because Teo is seeking legal advice from McKeon. Thus, PJMCK 0452 is

protected by the privilege. I am also satisfied that the crime-fraud exception is not invoked because

the document does not demonstrate any intent to commit a fraud nor does the communication appear

to be in furtherance of fraud.

      However, while Teo appears to have transmitted PJMCK 0453-0456 to McKeon for the

purpose of seeking legal advice, based on their content, these documents do not fall within the

protection of the attorney-client privilege. In In re Grand Jury Proceedings, 632 F.2d 1033 (3d Cir.

1980), the Third Circuit emphasized that the attorney-client privilege "provides legal basis for

refusing to produce [] documents if the transfer of documents is made for the purpose of obtaining

legal advice and if the documents in the hands of the client would have been privileged from

production." Id. at 1042 (citing Fisher, 425 U.S. at 403-04). Thus, here, the proper inquiry is

whether PJMCK 0453-0456 in the hands of Teo could have been obtained by subpoena. If answered

affirmatively, then Defendants cannot assert that the privilege shields the production of these same

documents sought in a subpoena directed McKeon. See In re Grand Jury Proceedings, 632 F.2d at

1042.

      While it appears that Teo gave PJMCK 0453-0456 to McKeon to obtain legal advice,

Defendants cannot establish that these documents were themselves privileged in the hands of Teo.

████████████████████████████████████████████ and thus, are clearly not

privileged communications. See, e.g., United States v. Osborn, 561 F.2d 1334, 1338-39 (9th Cir.

1977) (finding documents in client's possession not privileged under Fisher); In re Grand Jury

Empaneled May 7, 1987, Misc. No. 87-165, 1989 WL 72260, at \*6 (D.N.J. Jun. 29, 1989) (applying Fisher principles, court found documents sought were not privileged in hands of either client).

(l)     *PJMCK 0457 and 0458*

PJMCK 0457 and PJMCK 0458 are identical facsimile cover sheets ███████████ ████████████, except for six lines of handwritten notes on PJMCK 0457, ████████ ████████████████[18]██████████████████████████████████ █████████████████████████████████████████████████████ ██████████ (See 3/5/09 Sealed Trans., at 92:20-25 - 93:1, 95:4-6).

On their face, the documents reflect privileged communications between McKeon's office and Teo. Specifically, ███████████████████████████████████████ ███████████████████████████████████████████████████ ██████████ However, given the evidence that Teo resumed trading on behalf of the Trust in October 1998, and had McKeon file allegedly fraudulent Schedules 13D and amendments on behalf of the Trust and Teo in 1998, 1999, and up to and including March 2000, PJMCK 0457-0458 ███████████████████████████████████████████ These documents further show that Teo misused McKeon's services ████████████ ████████ in furtherance of the fraud. As such, the crime-fraud exception is invoked, and the Court orders PJMCK 0457-0458 to be produced.

---

[18] At the hearing, Defendants offered no evidence of the notes' author on PJMCK 0457. However, based on Defense counsel's argument and other circumstantial evidence proffered, presumably, the handwriting is either that of McKeon or one of his office staff employees.

    (m)    *PJMCK 0479-0481*[19]

PJMCK 0479-0480 appear to be part of an undated proxy statement, ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (See

3/5/09 Sealed Trans., at 96:20-25 - 97:1-2). PJMCK 0481 is Teo's handwritten note,████████████

████████████ Defense counsel represented that PJMCK 0479-0481 were fastened together

in McKeon's files. (See id. at 99:16-19).

In their March 18, 2009 supplemental written proffer, Defendants maintain that these

documents are protected by the attorney-client privilege. Based on this Court's review of the

documents and Defendants' March 18, 2009 written proffer, this Court finds that PJMCK 0479-0481

are not shielded from disclosure. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████ there is no indication that Teo gave these two documents to McKeon for the purpose of

seeking legal advice. As to PJMCK 0481, although it clearly reflects a communication between Teo

and McKeon, there is no evidence that it is a confidential communication wherein Teo is seeking

legal advice. Therefore, consistent with Fisher and Third Circuit precedent, the Court is satisfied

that PJMCK 0479-0481 are not privileged communications, and thus, shall be produced. See Fisher,

425 U.S. at 403-04; In re Grand Jury Proceedings, 632 F.2d at 1042.

---

[19] Documents PJMCK 0479-0481 and PJMCK 0489 are undated and vaguely described
on the privilege log. Nonetheless, the Court permitted Defendants to provide a more detailed
description of these documents on an amended privilege log to the SEC. The Court requested
that Defendants provide a supplemental proffer, after the hearing, so that the Court could
determine whether Defendants presented sufficient evidence to rebut the SEC's prima facie
showing of the crime-fraud exception.

(n)    *PJMCK 0489*

During the hearing, McKeon testified that PJMCK 0489 reflects his undated handwritten notes, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████ (See 3/5/09 Sealed Trans., at 105:3-11). In its March 18, 2009 supplemental proffer, Defendants provided additional evidence, which strongly suggests, that PJMCK 0489 was written in November 1997 ████████████████████████████████████████████████

Based on this supplemental proffer, the Court finds that the content of PJMCK 0489 reveals a privileged communication between Teo's attorneys. This Court further finds that given the November 1997 time frame, this document is temporally remote on its face from the alleged fraud beginning in July 1998 and the April 1998 decoupling. Thus, this Court is satisfied that PJMCK 0489 does not contain anything that would demonstrate a logical nexus between this communication and Teo's subsequent actions. PJMCK 0489, therefore, shall not be ordered produced.

F.    Collateral Estoppel

Alternatively, the SEC argues that the doctrine of collateral estoppel applies to the findings of Judge Hayden with respect to Exhibits 32-39 disclosed during the criminal case, and McKeon's testimony therein. The doctrine of collateral estoppel bars relitigation of issues that were actually litigated and necessary to the outcome of a first action in subsequent suits arising from different causes of action. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n. 5 (1979). A party offensively uses collateral estoppel "when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." Id. at 326 n.4. A party may use collateral estoppel in an offensive posture if the party

asserting it shows that:

> (1) the identical issue was previously adjudicated;
>
> (2) the issue was actually litigated;
>
> (3) the previous determination was necessary to the decision; and
>
> (4) the party being precluded from relitigating the issue was fully represented in the prior action.

United Indus. Workers v. of the Virgin Islands, 987 F.2d 162, 169 (3d Cir. 1993) (citations omitted).

Collateral estoppel is an equitable doctrine, bottomed in traditional notions of fairness. The Supreme Court has stressed that the doctrine should only be applied when "'the party against whom an estoppel is asserted had a full and fair opportunity to litigate....'" Parklane Hosiery Co., Inc., 439 U.S. at 328 (quoting Blonder-Tongue Laboratories, Inc. v. University of Illinois Found., 402 U.S. 313, 329 (1971)). The Supreme Court has made clear: "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." Blonder-Tongue Laboratories, Inc., 402 U.S. at 329.

Here, the SEC contends that, in the prior criminal trial against Teo, both Teo and the Trust were given a full and fair opportunity to argue the merits of whether Exhibits 32-39 were subject to the crime-fraud exception to the privilege. Although the Trust was not a party in the criminal case, the Trust is in privity with Teo. Thus, the Trust, along with Teo, are collaterally estopped from asserting that Exhibits 32-39 are protected by the attorney-client privilege in the pending civil action. This Court disagrees.

The Third Circuit has held that "[a] relationship is usually considered 'close enough' only when the party is a virtual representative of the nonparty, or when the nonparty actually controls the

litigation." <u>Collins v. E.L. Dupont de Nemours & Co.</u>, 34 F.3d 172, 176 (3d Cir. 1994). "Virtual representation does not mean merely that someone in the suit serves the interests of the person outside the suit. It requires a relationship by which the party in the suit is the legally designated representative of the non-party, as is made clear from the examples in the Restatement (Second) of Judgments." <u>Id.</u> at 176-77. <u>Accord</u> Restatement (Second) of Judgments § 41 (1982).

Here, Teo is not the "virtual representative" of the Trust. Teo only had trading and voting authority over assets in the Trust. He did not have full beneficial ownership in those assets. Teo and the Trust are two distinct legal entities. Additionally, as the prior case was a criminal proceeding, the Trust could not intervene in that matter or even participate in any meaningful way. To permit findings made at a criminal proceeding against Teo to bind the Trust, albeit arising from the same alleged unlawful conduct at issue in the criminal case, is contrary to principles of fundamental fairness.

Nor is this Court satisfied that collateral estoppel even applies to Teo. On June 27, 2006 – midway through the trial – Teo pled guilty to five counts of securities fraud for insider trading in Musicland and another company, C-Cube securities. Following his sentence in January 2007, the remaining counts of the Superceding Indictment were dismissed, including those counts relating to Teo's alleged false Schedule 13D filings. Accordingly, the issue of whether the communications (encompassed within Exhibits 32-39) fell within the crime-fraud exception was not actually litigated in connection with Teo's conviction. Judge Hayden issued a final judgment of conviction based on the parameters of Teo's plea agreement with the United States Attorney's Office. The factual findings of the application of the crime-fraud exception to McKeon's communications with Teo were not essential to the judgment of conviction. The SEC has, therefore, not shown the requisite

50

elements for offensive issue preclusion to apply with regards to Teo and the Trust. For the reasons set forth above, collateral estoppel does not apply to the findings of Judge Hayden, either to Teo or the Trust.

        G.     Waiver of the Attorney-Client Privilege

As to the issue of waiver, the SEC argues that Defendants did not take any steps to limit or seal any of the otherwise privileged documents or testimony that were disclosed during the public criminal trial. Specifically, McKeon testified in open court during the criminal case. Moreover, both the United States Attorney's Office and Teo's defense counsel electronically filed Exhibits 32-39, regarding the government's in limine motions raised in the criminal case. The SEC submits, therefore, that the privilege has been waived.

Defendants argue that Teo's counsel was compelled in the criminal trial to testify and to produce Exhibits 32-39, pursuant to Judge Hayden's April 17, 2006, Order. As such, Defendants have not voluntarily waived their right to assert the attorney-client privilege as to these documents or McKeon's trial testimony. This Court disagrees.

While the involuntary or compelled production of privileged documents does not generally waive otherwise applicable claims of privilege, see, e.g., Leonen v. Johns Manville, 135 F. R.D. 94, 99 (D. N.J. 1990), simply objecting to production is not enough. Rather, the privilege holder must take "reasonable steps to protect its claim of privilege and protection." Int'l Union of Operating Eng'rs, Local 132 v. Philip Morris, Inc., No. 97-0708, 1999 WL 33659387, at * 2 (S.D. W. Va. Jun. 28, 1999). Thus, in International Union, the court found no waiver only where the subpoenaed parties took clear and forceful steps to protect the privilege: by seeking interlocutory review, attempting to convince the Commerce Committee Chair to reconsider his position, and only

51

producing the documents when faced with criminal contempt. Id. Compare St. CYR v. Flying J, No. 06-13-J-33TEM, 2008 WL 2097611, at * 2 (M.D. FL May 16, 2008) (waiver found where counsel took no steps to protect privilege other than to object generally to production at deposition).

While the Third Circuit has not spoken directly on this issue, it has made clear that the act of filing a document with a court creates a presumptive right of public access. Pansey v. Borough of Stroudsburg, 23 F.3d 772, 782 (3d Cir. 1994). Thus, a party's act of filing a document with the court places it in the public domain. Bank of America Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 344 (3d Cir. 1986). In Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (3d Cir. 1993), the Third Circuit highlighted that several other courts have recognized "the principle that the filing of a document gives rise to a presumptive right of public access." Id. at 162-63. See, e.g., FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 409 (1st Cir. 1987) ("documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies"); Crystal Grower's Corp. v. Dobbins, 616 F.2d 458, 460-61 (10th Cir. 1980) (same).

Here, Judge Hayden's April 2006 Order compelled McKeon's testimony at trial. Thereafter, Teo's counsel produced McKeon's notes and other documents. (See SEC 7/9/08 Opp. Bf at 13-14). Six of those documents were written communications between McKeon and Teo. The government moved to introduce these six documents into evidence and electronically filed them with the Court. (See id. at 14; see also Murray Decl., Exhs. 32-37). Teo's attorney also electronically filed a letter, attaching McKeon's additional notes detailing conversations with Teo in 1998. (See SEC 7/9/08 Opp. Bf at 14; see also Murray Decl., Exhs. 38-39).

Yet, Teo did not seek an order sealing the documents.[20] Indeed, Teo took no steps to protect the privileged status of the documents. His attorney did not apply for a temporary sealing order to shield the documents from the public at the time they were filed with the Court. Teo did not request an in camera inspection to determine whether the documents should be properly kept under seal. With respect to McKeon's testimony, Teo neither sought to seal the courtroom nor took an interlocutory appeal of Judge Hayden's pretrial ruling. In short, since 1996, these documents have been in the public domain for the world to view. Similarly, McKeon's trial testimony was open to the public to hear.

Accordingly, this Court is satisfied that the electronic filing of Exhibits 32-39 in the criminal proceeding, and the open testimony of McKeon, without any measures to preserve the privilege, constitutes a waiver. See Hotel Rittenhouse Assocs., 800 F.2d at 344. See, e.g., Vardon Golf Co. v. Karsten Manufacturing Corp., 213 F.R.D. 528, 532-33 (N.D. Ill. 2003) (holding that proponent of privilege waived its assertion by attaching privileged documents to party's public filing without placing documents under seal); Kaminski v. First Union Corp., No. 99-1509, 2001 WL 793250, at * 2 (E.D. Pa. Jul. 10, 2001) (since defendant twice placed the allegedly privileged document into "the public record by filing it with the Court, it has waived the attorney client privilege as to that document."); McGreevy v. CSS Industries, Inc., No. 95-8063, 1996 WL 412813, * 3 (E.D. Pa. Jul. 17, 1996) (finding that "regardless of counsel's intent, the filing of the McGreevy Memorandum as a judicial document places it in the public domain and is inconsistent with a claim of privilege.")

Therefore, Defendants' application for an injunction to prevent the SEC from using Exhibits

---

[20] As noted above, all of these filed documents have been identified in this case as Exhibits 32-39 as part of the Murray Declaration.

32-39 is denied.  The Court orders the following documents to be produced:

       1.  PJMCK 0351/Murray Decl., Exh. 38

       2.  PJMCK 0352-0353/Murray Decl., Exh. 33

       3.  PJMCK 0354-0356/Murray Decl., Exh. 32

       4.  PJMCK 0390-0391/Murray Decl., Exh. 36[21]

## IV.    CONCLUSION

Based on the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to quash, and **DENIES** Defendants' application for a use injunction.  An accompanying appropriate order will be filed in connection herewith.

_____

Madeline Cox Arleo
United States Magistrate Judge

Dated: June 11, 2009

cc:    Hon. Susan D. Wigenton, U.S.D.J.
       Clerk of the Court
       Parties

---

[21] The Court notes that the documents attached to the Murray Declaration as Exhibits 35, 37 and 39 have not been identified on Defendants' privilege log or amended privilege log.  In any event, given the Court's ruling that the privilege has been waived as to Exhibits 32-39, these three documents shall be produced.