NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE
COMMISSION,

SEC,

v.

ALFRED S. TEO, SR., *et al.,*

Defendants.

Civil Action No. 2:04-cv-01815
(SDW) (MCA)

**OPINION**

August 10, 2010

Before the Court and in accordance with Federal Rule of Civil Procedure 56(c), are the

Securities and Exchange Commission's (SEC) Motion for Summary Judgment; Defendants',

Alfred S. Teo, Sr. and the MAAA Trust, Motion for Partial Summary Judgment; and

Defendant's, Mitchell L. Sacks, Motion for Partial Summary Judgment.  This Court has

jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).  Oral

argument for these motions was heard on April 20, 2010.  For the reasons discussed below, the

SEC's motion is **DENIED** in part and **GRANTED** in part, Teo and MAAA's motion is

**DENIED**, and Sacks's motion is **DENIED**.

**PROCEDURAL HISTORY**

The SEC filed a complaint against Defendants on April 22, 2004, listing several claims of

insider trading and false filings.  Teo reached an agreement with the SEC encompassing the

insider trading claims (Claims 1, 4, and 5) on March 15, 2010. (Consent J. Mar. 15, 2010, Doc.

No. 245.)  Therefore, the only claims remaining against Teo and the Trust are claim 7 for

violations of Sections 10(b) and 13(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(d), and

Rules 10b-5, 12b-20, 13d-1, and 13d-2 , 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13d-1, and 240.13d-2; and claim 8 for violations of Section 16(a) of the Exchange Act, 5 U.S.C. § 78p(a), and Rules 12b-20 and 16a-3, 17 C.F.R. §§ 240.12b-20 and 240.16a-3.

The SEC alleges that on July 30, 1998, Teo submitted materially false statements in the form of a Schedule 13D disclaiming beneficial ownership of stock of Musicland Stores Corporation (Musicland) while "[f]rom at least April 18, 1998 until January 2001, Teo continued to have investment and voting power over the Musicland stock in the MAAA Trust's name." (Compl. ¶¶ 109-10.)  In addition, the SEC argues that Teo also filed Schedules 13D containing materially false information on September 3, 1998 and May 10, 1999, as he also failed to disclose in these filings that he "had investment and voting power over the Musicland stock in the MAAA Trust's name."  (Compl. ¶¶ 111-12.)    Finally, the SEC alleges that Teo continued to violate the Securities and Exchange Act by failing to file Schedules 13D after May 10, 1999, disclosing Teo's acquisition of additional Musicland stock through accounts owned by him, other companies he controlled, and the MAAA Trust; his investment and voting power over Musicland stock held in the MAAA Trust; and his "plans to change the membership of Musicland's Board or cause a reorganization of Musicland by converting it into a private company."  (Compl. ¶¶ 113, 184.)

The Complaint also states that Teren Seto Handelman[1], Trustee of the MAAA Trust, filed Schedules 13D on behalf of the Trust on February 9, 2000 and March 10, 2000.  (Compl. ¶ 114.) According to the SEC, both of these Schedules contained materially false information as they failed to disclose "that Teo had voting and investment power over the MAAA Trust's Musicland stock . . . [and] Teo's plans to change the membership of Musicland's Board or cause

---

[1] Teren Seto Handelman consented to a Final Judgment on June 19, 2007, resolving all claims alleged against her in the Complaint.

reorganization of Musicland by converting it to a private company." (Compl. ¶ 115.) In addition, no Schedules 13D were filed after March 10, 2000 indicating further purchases of Musicland stock. (Compl. ¶ 116.)

The SEC alleges in claim eight of the Complaint, that Teo and the Trust violated Section 16(a) of the Securities and Exchange Act by filing seven materially false Forms 4 between July 1998 and May 1999 that did not disclose "Teo's beneficial ownership of Musicland stock held in the MAAA Trust's name." (Compl. ¶¶ 120-30, 188-90.) Also alleged, is that Teo violated Section 16(a) by not filing any Forms 4 or 5 after May 1999, although he owned more than 10% of Musicland's stock. (Compl. ¶¶ 126-27.) Also, no Forms 4 or 5 were filed on behalf of the Trust reflecting its ownership of Musicland stock. (Compl. ¶ 129.)

The sixth claim of the complaint also contains allegations, that Sacks violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (Compl. ¶¶ 178-82.) The SEC states that when Sacks "purchased [C-Cube Microsystems, Inc. ("C-Cube")] stock, he knew, or was reckless in not knowing, that the information concerning [Cirrus Logic, Inc.'s ("Cirrus")] intent to acquire C-Cube was material and non-public and had been communicated to him as a result of a breach of fiduciary or other similar duty arising out of a relationship of trust and confidence" and therefore seeks a permanent injunction against Sacks prohibiting any future violations. (Compl. ¶¶ 181.)

Sacks and Teo were both criminally indicted on August 18, 2004, for insider trading. (Indict. 04-Cr-583, Aug. 18, 2004.) The civil proceedings were stayed and the matter was administratively terminated pending resolution of the criminal case against Defendants. (Order May 20, 2005 – Doc. No. 47; Order May 24, 2005 – Doc. No 48.) In the midst of trial, Teo pled guilty to insider trading in connection with his purchases of C-Cube and Musicland stock. (Teo

Crim. J. Jan. 6, 2007, No. 04-0583.)  He was sentenced to thirty months incarceration and fined $1 million.  *Id.* Sacks pled guilty to unauthorized access to computers.  (Sacks's Crim. J. Nov. 13, 2007, No. 04-583-03.)  Sacks was sentenced to probation for a term of one year and fined $5,000.  (Sacks's Crim. J. Nov. 13, 2007, No. 04-0583.)  This matter was restored to the active docket on August 16, 2006.  (Order Aug. 16, 2006 – Doc. No. 53.)

## FACTS

### TEO AND THE MAAA TRUST

Musicland was a public company traded on the New York Stock Exchange specializing in the sale of music and books.  (J.A. 3 at 10-12.)  In 1995, Musicland enacted a Shareholder Rights Agreement, commonly called a "poison pill."  (J.A. 3 at 14.)  The purpose of the poison pill was to prevent the hostile takeover of Musicland by an individual or group acting in concert that was not in the best interest of Musicland or unfair to other shareholders.  (J.A. 3 at 14.)  The poison pill could be activated when an individual or group of people acquired 17.5% of the company's stock.  (J.A. 3 at 16.)  In the event of a shareholder activating the poison pill, the company had several courses of redress available, including diluting the acquiring party's stock value by allowing the remaining shareholders to buy large amounts of stock at a lower rate.  (J.A. 3 at 16.)  Musicland relied on statements (Schedules 13D) required to be filed by shareholders owning over 5% of the company's stock pursuant to Section 13(d) of the Securities and Exchange Act of 1934, as the most reliable means of determining how much stock each shareholder owned.  (J.A. 3 at 24.)

Teo has admitted to having an informal "purchasing program" where he would buy large sums of Musicland stock monthly.  (Teo Dep. 298, July 24, 2001.)  In accordance with his purchasing plan, Teo would usually buy between 250,000 and 500,000 shares of Musicland stock

every month depending on the amount of funds available to him at the time. (Teo Dep. 298, July 24, 2001; J.A. 33.) Teo's plan was to "eventually-hopefully, [] take the company private [himself]." (Teo. Dep. 298, July 24, 2001.) He communicated his desire to make Musicland a private company to Jack Eugster, Chief Executive Officer and Chairman of the Board of Directors of Musicland, and Keith Benson, Chief Financial Officer of Musicland. (Teo Dep. 91-92, July 24, 2001.) From February 1997 to October 1997, Teo's ownership of Musicland stock jumped from 5.25% to over 14%. (J.A. 3 at 38; J.A. 17; J.A. 36.) In a memo dated November 6, 1997, Eugster was notified of a SEC filing reporting Teo's ownership of 15.27% of Musicland stock. (J.A. 3 at 40-41; J.A. 42.)

Aside from his individual purchases of Musicland stock, Teo was also making investment decisions on behalf of the MAAA Trust (the Trust). (See Teo Dep. 37-38, Oct. 27, 2009.) The Trust was established in December 1992 for the benefit of Teo's four sons, with James McKeon, Teo's attorney at that time, and Annie Teo, Teo's wife, as trustees. (J.A. 65.) Originally Teo had authorization to trade securities for the Trust. (J.A. 15 at 37; J.A. 90.) A Schedule 13D filed on February 14, 1997, listed the Trust's ownership of Musicland shares at .59% and Teo's ownership at 4.66%. (J.A. 17.)

On July 30, 1998, Teo filed a Schedule 13D indicating that his authorization to trade securities for the Trust had been revoked and therefore he was no longer a beneficial owner of Musicland stock held by the Trust. (J.A. 90.) A document was attached to that Schedule 13D, indicating that Teren Seto Handelman, Teo's sister-in-law, was the sole trustee at that time. (J.A. 90.) In another Schedule 13D filed on February 9, 2000, Handelman reported that the Trust owned 2,550,000 shares of Musicland equaling 6.96% of that class of stock. (J.A. 151.) The

SEC calculates that the Trust reached ownership of approximately 11.89 % of Musicland's outstanding shares by December 6, 2000. (Yanez Decl. at 7, Jan. 22, 2010.)

After the Schedule 13D was filed in July 1998, Teo continuously stated to Benson and Eugster that he no longer controlled the shares of Musicland stock held by the Trust. (J.A. 1 at 40; J.A. 3 at 57.) However, in an October 27, 2009 deposition, Teo stated that from February 1997 until 2001, he traded securities on behalf of the Trust and no one else directed the disposition of securities held by the Trust during that time period. (J.A. 15; Teo Dep. At 37-38, Oct. 27, 2009.)

Officials at Musicland did suspect that Teo had not relinquished control of the Trust funds. (J.A. 1 at 41;J.A. 8 at 150.) Heidi M. Hoard, Musicland's general counsel, stated in her deposition that although officials at Musicland had no concrete proof that Teo did not control the shares owned by the Trust, they were concerned about the close communications between Teo, his wife, other companies controlled by him and the Trust. (J.A. 8 at 9-10, 150-51.) Although no official investigation was initiated by Musicland, Keith Benson started recording notes of his telephone conversations with Teo. (J.A. 1 at 41.) Generally, Benson was looking for any innuendo of whether Teo was acting in concert with the other entities and whether a hostile takeover was likely. (J.A. 1 at 42-43.) Benson noted conversations with Teo on July 28, 2000, and August 15, 2000, where Teo admitted that he and his family had ownership of thirty percent and forty-five percent of Musicland stock. (J.A. 1 at 43-47.)

Teo and the Trust were required, when necessary, to file Forms 3 (Initial Statement of Beneficial Ownership), Forms 4 (Statement of Changes in Beneficial Ownership), and Forms 5 (Annual Statement) in accordance with Section 16(a) of the Exchange Act. See also 17 C.F.R. §§ 240.12b-20 and 240.16a-3. From July 29, 1998 to May 10, 1999, Teo filed several Forms 4

6

that only included himself, Annie Teo, Alpha Industries, Inc. Retirement Plan, Alpha

Technologies, Inc., and Lambda Financial Service Corp. as the reporting persons or groups.

(J.A. 86, 95, 104, 137-39.)  The SEC did not receive any filings on Form 3, Form 4, or Form 5

on behalf of Teo from June 1, 1999 to December 31, 2000.  (Murray Decl. Ex. 3, Jan. 21, 2010.)

Teo, who already owned over 10% of Musicland's outstanding shares, continued to make

purchases of Musicland stock during this time period.  (Yanez Supp. Decl. Ex. A, Feb. 22, 2010.)

No Forms 3, Forms 4, or Forms 5 were received by the SEC on behalf of the Trust from March

11, 2000 to December 31, 2000.  (Murray Decl. Ex. 3, Jan. 21, 2010.)

**SACKS**

Sacks is forty six years old and married with four children.  (Critchley Decl. Ex. 1 at 1.)

He obtained a Bachelor of Arts degree in economics from Cornell University in 1985 and an

MBA in finance from New York University in 1989.  (Critchley Decl. Ex. 1 at 2.)  From 1985 to

1991 he worked for several investment banking firms and then became Vice President of Finance

with TSR Wireless, Inc. ("TSR"), a privately held telecommunications company.  (Critchley

Decl. Ex. 1 at 2.)  Then, from approximately April 2001 to April 2002, Teo and Sacks were

partners in the investment management firm Tau Sigma Capital Partners.  (Critchley Decl. Ex. 1

at 2.)

The partnership between Sacks and Teo dissolved in April 2002 "as a result of

management differences with Teo and after [Sacks] received notice of the investigation that gave

rise to the instant litigation."  (Critchley Decl. Ex. 1 at 2.)  Since April 2001, Sacks has been the

principal of another investment management firm, Grand Slam Asset Management.  (Critchley

Decl. Ex. 1 at 1.)

7

In 1999, Teo recommended to Philip Sacks, Sacks's father, that he purchase stock of Musicland. (Sacks Dep. at 18-19, Aug. 7, 2008.)  In the fall of 2000, Teo was the largest shareholder of Musicland and learned from communications with senior management of an upcoming acquisition. (Compl. ¶ 2.)  From November 3 to November 19, 2000, Sacks purchased almost $1 million of Musicland stock through various accounts including those of his children, wife, and father. (Sacks Dep. at 32-36, Aug. 7, 2008.)  Sacks sold most of the Musicland shares in mid to late December after a December 7, 2000 announcement that Best Buy would acquire Musicland. (Sacks Dep. at 39-44, Aug. 7, 2008.)  The sale of these shares yielded a profit of over $500,000 in Philip Sacks's account alone. (Sacks Stmt. Ex. 3, Jan. 22, 2010.)

Shortly thereafter, still in December 2000, Sacks purchased shares of Cirrus without researching the company and also after Teo's recommendation. (Sacks Dep. at 58-60, Aug. 7, 2008.)  Teo, a director at Cirrus, was present at a February 21, 2001 Board of Directors meeting where the Board focused on the possible acquisition of C-Cube and Oak Technology, Inc. ("Oak") and also considered ESS Technology, Inc. ("ESS") as an acquisition target. (Murray Decl. Exs. 17, 20, Aug. 14, 2009.)  A final determination was not made at that meeting, but the Board requested that a report regarding the acquisition be delivered at the next meeting on March 2, 2001. (Murray Decl. Exs. 17, 20, Aug. 14, 2009.)  Sacks purchased 20,000 shares of Oak stock on March 1, 2001, and 20,000 shares each of C-Cube and ESS stock on March 2, 2001, for the accounts of several family members including his father, Philip Sacks. (Critchley Decl. Exs. 7, 10, 17, Sept. 4, 2009.)

According to minutes dated March 2, 2001, 6:30 p.m., the Board of Directors of Cirrus decided to continue discussions with both Oak and C-Cube regarding an acquisition but did not

8

make a final determination at that time. (Murray Decl. Ex. 21, Aug. 14, 2009.) Unbeknownst to Cirrus, C-Cube was also in negotiations with LSI Logic Corporation which announced its acquisition of C-Cube on March 26, 2001. (Critchley Decl. Ex. 14, Sept. 4, 2009; David Damien French Dep. 80, Apr. 7, 2009.) Sacks then sold the shares realizing a profit of approximately $115,155. (Comp. ¶ 3.)

Sacks was deposed on several occasions in connection with this matter. On June 27, 2002, Sacks declared that prior to purchasing C-Cube stock, he had a general conversation with Teo regarding the semiconductor sector but that they did not discuss the purchase of C-Cube stock.[2] (Critchley Decl. Ex. 10 at 13-17, Sept. 4, 2009.) However, at his plea and sentencing hearing on November 13, 2007, Sacks agreed that "Mr. Teo provided [him] with material, non-public information concerning C-Cube"; that he then accessed Bloomberg.com to obtain more information related to C-Cube; and that he purchased shares of C-Cube after he utilized information that he received by exceeding his authorized access to Bloomberg. (Murray Decl. Ex. 4, Aug. 14, 2009.) At an August 7, 2008 deposition, Sacks returned to his original testimony that he thought he was having a general discussion with Teo regarding the semiconductor industry and that he did not believe at that time that Teo was providing him with material non-public information. (Critchley Decl. Ex. 11 at 74-75, Sept. 4, 2009.) Sacks testified that:

> having been, you know, on the board of directors, and having done M and A transactions, and having, you know, spoken and met with many people who were on boards of directors, and had spoken about their industry, it certainly was not my belief that my conversation with Mr. Teo was at the time providing me with any kind of non-public information.

[Critchley Decl. Ex. 11 at 75, Sept. 4, 2009.]

---

[2] This Complaint was not filed until 2004, but Sacks was deposed in 2002 during an SEC investigation entitled: In the Matter of Trading in the Securities of C-Cube Microsystems, Inc. (File No. SF-2482). (See Critchley Decl. Ex. 10, Sept. 4, 2009.)

He also acknowledged that prior to this matter he understood that insider trading laws prohibited trading "while in the possession of material non-public information." (Murray Decl. Ex. 6, Aug. 14, 2009.)

## DISCUSSION

### SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56 also mandates that adequate time is allowed for discovery before the entry of summary judgment. *Beard v. Banks*, 548 U.S. 521, 530 (2006). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

10

**MOTIONS RELATING TO CLAIMS 7 AND 8 OF THE COMPLAINT**

The SEC argues that summary judgment is appropriate for all of the claims remaining in this matter. Teo and the Trust oppose the SEC motion for summary judgment and request that this Court strike both the declaration of Sandra Yanez, an SEC employee, and the testimony of James McKeon. Further, Teo and the Trust have submitted a motion for partial summary judgment arguing that disgorgement should be rejected.

**Section 13(d)**

Section 13(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78m(d), requires that "persons acquiring more than five per centum of certain classes of securities . . . shall, within ten days after such acquisition, . . . file with the Commission, a statement (Schedule 13D)" identifying the security and issuer as well as certain other information including:

> (A)    the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;
>
> (B)    the source and amount of the funds or other consideration used or to be used in making the purchases, . . .;
>
> (C)    if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;
>
> (D)    the number of shares of such security which are beneficially owned, . . .; and
>
> (E)    information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, . . . .
>
> [15 U.S.C. § 78m(d); see also 17 C.F.R. § 240.13d-1.]

The filer of a Schedule 13D must also submit an amendment in the event of a material change with respect to the contents of a previously filed Schedule 13D. 15 U.S.C. §78m(d)(2). A

11

material change is defined as, but not limited to "any material increase or decrease in the percentage of the class beneficially owned." 17 C.F.R. ¶ 240.13d-2(a). A beneficial owner is "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
>
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

[17 CFR 240.13d-3.]

The purpose of Section 13(d) is "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *IBS Fin. Corp. v. Seidman & Assocs., L.L.C.*, 136 F.3d 940, 945-46 (3d Cir. 1998). The courts have interpreted that the Legislature's intent was to alert investors to changes or potential changes in corporate control so that they could effectively make investment decisions and evaluations. *GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971). False or misleading disclosures defeat the purpose of this section. *Id.*

In addition, the false or misleading disclosures must be material. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). "The issue of materiality is a mixed question of law and fact." *Id.* "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 449). The Supreme Court has warned that this is a "delicate assessment" that requires the court to review "the inferences a 'reasonable shareholder' would draw from a given set of facts

and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450.

However, the fact that the SEC requires certain information to be revealed in a Schedule 13D is evidence of materiality. *United States v. Bilzerian*, 926 F.2d at 1298; see also *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir. 1989) (stating that "[d]isclosures mandated by law are presumably material" but also clarifying that materiality is a mixed question of law and fact). Courts have not yet gone as far as to hold the information requested on Schedules 13D to be material per se. See *United States v. Bilzerian*, 926 F.2d at 1298. This determination presents a challenge at the summary judgment stage and courts have found that "[o]nly if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450 (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (D.C.A. 1970)); *In re Craftmatic Sec. Litig.*, 890 F.2d at 641(stating that "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law"); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1166 (D.C. Dir. 1978) (holding that a defendant's participation in a group that owned more than 5% of the outstanding shares in a corporation "may well not be so obviously important that reasonable minds would not differ as to its materiality" but when coupled with prior criminal convictions, the omission became material).

Although the SEC cites Magistrate Judge Arleo's June 11, 2009 Opinion on the issues of materiality and scienter, Judge Arleo addressed materiality and scienter for the purpose of determining "whether the SEC had made a prima facie showing of the crime-fraud exception"

13

and not in the course of a summary judgment motion as is the case here. *SEC v. Teo*, Civ. No. 04-1815, June 12, 2009. In the present application, Teo has admitted to solely exercising the power to make investment decisions regarding the Trust's funds. A reasonable shareholder could easily determine, and Defendant does not seem to dispute, that Teo was a beneficial owner of the shares of Musicland owned by the Trust. However, various courts have emphasized that determinations of materiality are best left to juries and that such questions should only be resolved via summary judgment when reasonable minds could not differ as to the outcome. As is the case in this and other jurisdictions, this Court will not find that the failure to disclose Teo's beneficial ownership is material per se. The question of materiality in this case is best resolved by the trier of fact.

Such is also the case as to whether Teo failed to disclose his plan or purpose. Other courts have noted that "the degree of specificity with which future plans must be detailed in Schedule 13D filings presents a difficult question." *S-G Sec., Inc. v. Fuqua Inv. Co.*, 466 F. Supp. 1114 (D. Mass. 1978). A beneficial owner must disclose whether "the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities." 15 U.S.C. § 78m(d). However, the plan "must be 'something more definite than vaguely formed thoughts for the future." *Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 491 (D.N.Y. 2009). Premature disclosures are discouraged as it would also be an infringement of Section 13(d) to overstate indefinite plans. *Id.* Further, Section 13(d) does not require disclosure of "preliminary considerations, exploratory work, or tentative plans." *Azurite Corp. v. Amster & Co.*, 844 F. Supp. 929, 934-35 (S.D.N.Y. 1994) (holding that summary judgment was appropriate because defendant had failed to put forth a triable issue of fact regarding when defendant's intentions were formed); *see also Greenfield v. Heublein, Inc.*, 575 F. Supp. 1325, 1336 (E.D. Pa.

14

1983) (holding that preliminary merger discussions were not material omissions and did not violate Rule 10b-5 or Section 41(e) because no agreements had been finalized).

For the aforestated reasons, summary judgment is not appropriate at this juncture on the issue of materiality. Genuine issues of fact also exist as to the definiteness of Teo's plans. Although Teo communicated his desire to acquire control of and eventually privatize Musicland, this Court cannot determine as a matter of law that those plans were sufficiently solidified to constitute a material Schedule 13D omission. This Court denies the portion of the SEC's motion requesting summary judgment as to a violation of Section 13(d).

**Section 10(b)**

The SEC asserts that Teo's false Schedule 13D filings also comprise a violation of 15 U.S.C. 78j(b) (Section 10(b)). "A false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of [Section] 10(b)." *United State v. Bilzerian*, 926 F.2d at 1298. To prove a violation of Section 10(b), the SEC must establish "(1) misrepresentations or omissions of material fact; (2) in connection with the offer, sale or purchase of securities; and (3) that the defendants acted with scienter." *SEC v. Chester Holdings, LTD*, 41 F. Supp. 2d 505, 519 (D.N.J. 1999).

To meet the scienter requirement, the SEC must prove that "defendant[] lacked 'a genuine belief that the information disclosed was accurate and complete in all material respects.'" *Id.* (quoting *In re Philips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989)). Either knowing or reckless misconduct on behalf of defendant would be sufficient to meet the scienter requirement. *Id.* As with Section 13(d) violations, materiality of the misstatement or omission is a prerequisite. *United State v. Bilzerian*, 926 F.2d at 1298.

15

For the reasons stated in the Section 13(d) discussion above, this Court cannot reach a determination as to Section 10(b) since the issue of materiality cannot be decided as a matter of law.

## Section 16(a)

Section 16(a), 15 U.S.C. § 78p(a), requires that "every person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" shall file statements reporting their ownership to the SEC. The SEC's regulations specify that initial statements of beneficial ownership of equity securities must be filed on Form 3; changes in beneficial ownership must be filed on Form 4; and anyone "who at any time during the issuer's fiscal year was subject to [S]ection 16" must file an annual statement on Form 5. 17 C.F.R. § 240.16a-3.

For purposes of Section 16(a), "beneficial owner" refers to "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities." Pecuniary interest is further defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1. The Seventh Circuit has held that "ties of affinity or consanguinity" between the beneficiary of a trust and a corporate insider are insufficient to prove a direct or indirect benefit but clarified that a finding that the defendant "was able to use income or assets of the trust to pay his personal expenses" would establish such benefit. *CBI Indus. Inc., v. Horton*, 682 F.2d 643, 646-47 (7th Cir. 1982).

Teo has admitted to solely exercising the power to make investment decisions for the Trust and on at least one occasion transferred $5 million between the Trust and Alpha Industry, a company he controlled. Additionally, Teo transferred Musicland shares between his personal

16

account and the Trust's account. (Yanez Supp. Decl. Ex. B, Feb. 22, 2010.) Teo's control of the Trust and his actions involving transfer of funds between the Trust and his corporate account indicate that he had a pecuniary interest in the securities held by the Trust and was the beneficial owner of the Musicland stock held in the Trust's name.

Teo's failure to include the Trust as a reporting entity in his Section 16(a) filings between July 1998 and May 1999 constitutes a violation of Section 16(a). Further, Teo did not file statements of changes in beneficial ownership (Forms 4) or the annual statement (Form 5) although his ownership of Musicland shares was above the 10% filing threshold between June 1999 and December 2000. This Court will grant the SEC's motion as to claim 8 of the Complaint, and finds, as a matter of law, that Teo violated Section 16(a) of the Securities and Exchange Act, 5 U.S.C. § 78p(a).

The SEC's motion must be denied as it relates to the Trust because there is a genuine issue of material fact as to when exactly the Trust acquired 10% ownership of Musicland's shares. Documents have been submitted both by the SEC and on behalf of the Trust with conflicting information as to how many outstanding shares existed at different times. For example, Yanez's declaration lists the number of outstanding shares on December 31, 1998, as 34,458,037 while documents attached to the declaration of Amy Luria list the number of outstanding shares on that date as 36,041,700. (Yanez Decl. Ex. A, Jan. 22, 2010; Luria Decl. Ex. 5, Feb. 22, 2010.) Also, Yanez lists the number of outstanding shares on February 2, 2000, as 36,065,271, and Luria's declaration indicates that that number was actually 36,604,674. (Yanez Decl. Ex. A, Jan. 22, 2010; Luria Decl. Ex. 6, Feb. 22, 2010.) These discrepancies are immaterial as to whether Teo himself violated Section 16(a) as there is no dispute that he owned over 10% of Musicland's outstanding shares and continued to make purchases during the

indicated time. However, it does create a genuine issue of material fact as to whether and when the Trust acquired 10% of Musicland's outstanding shares and became obligated to file statements pursuant to Section 16(a). The SEC's motion against the Trust, concerning Section 16(a) liability, is denied.

**Yanez Declaration and Mckeon Testimony**

Teo argues that the Declaration of Sandra Yanez in Support of the SEC's Motion for Summary Judgment (Declaration) should be stricken from the record. Teo does not dispute the availability of the information used to compile the Declaration but that Ms. Yanez was not previously presented for depositions and that the calculations of total outstanding shares of Musicland stock are inaccurate. This Declaration consists of Ms. Yanez's summary of over 700 pages of the sales, purchases, and profits of several of the Defendants' accounts.

Federal Rule of Evidence 1006 provides that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The Declaration is admissible as a summary. However, the SEC shall make Ms. Yanez available for deposition.

Teo also argues that James McKeon's "testimony is obviously hearsay and thus presumptively incompetent evidence to support a summary judgment motion absent a hearsay exception." This Court has not relied on McKeon's testimony in making its findings. The argument is therefore moot.

**Disgorgement**

Teo and the Trust have moved for partial summary judgment on the issue of disgorgement of profits. Disgorgement is permissible for violations of both Section 13(d) and Section 16(a). 15 U.S.C. § 78p(b); see also *SEC v. Antar*, 97 F. Supp. 2d 576, 578 (D.N.J. 2000) (stating that "[c]ourts have the authority . . . to order disgorgement of insider trading profits"). The primary purpose of disgorgement is to prevent unjust enrichment and deprive the violator of ill-gotten gains. *SEC v. Antar*, 97 F. Supp. 2d at 578. It is an equitable remedy and thus the district court "is invested with broad discretion in fashioning an appropriate disgorgement order." *Id.*

Since the reason for disgorgement is equity, it is not to be used punitively and the amount of disgorgement should be a reasonable approximation of the unlawful profits. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996). Initially the SEC has the burden of establishing that the disgorgement amount is a reasonable approximation of the profits obtained due to the violation. *Id.*; see also *SEC v. Antar*, 97 F. Supp. 2d at 578. Then the burden shifts to the defendants to prove "that the disgorgement figure is not a reasonable approximation." *SEC v. Antar*, 97 F. Supp. 2d at 578; see also *SEC v. Hughes Capital Corp.*, 971 F. Supp. at 1085.

For all of the reasons set forth herein, the issue of liability cannot be fully resolved by this Court. Thus, summary judgment on the issue of disgorgement is not appropriate and both motions are denied as they relate to disgorgement.

**MOTIONS RELATING TO CLAIM 6 OF THE COMPLAINT**

For the SEC to establish liability against a tippee pursuant to Section 10(b), 15 U.S.C. §78j(b), this Court must "find sufficient evidence to permit a reasonable finding that": (1) the tipper "possessed material non-public information"; (2) the tipper disclosed that information to

19

the tippee; (3) the tippee traded in the security "while in possession of that non-public information"; (4) the tippee "knew or should have known" that the tipper violated a relationship of trust by relaying the information; and (5) the tipper benefited by the disclosure to the tippee. *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (citing *Dirks v. SEC*, 463 U.S. 646, 654-64 (1983)).

If it appears to the Securities and Exchange Commission "that a person is engaged in acts in violation of the securities laws, an action to enjoin those acts may be brought and, upon a proper showing by the [SEC], the court shall grant the injunctive relief requested." *SEC v. Bonastia*, 614 F.2d 908, 910 (3rd Cir. 1980). The purpose of injunctive relief is not punitive but is to protect the investing public and deter future infractions of the securities law. *Id.* The Third Circuit set out five factors to guide the court in determining "whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct," and to therefore grant a permanent injunction. *Id.* The five factors should not be assessed individually, instead the totality of the circumstances should be considered in reaching a decision. *Id.*

The first factor the court considers is "the degree of scienter involved on the part of the defendant." *Id.* The defendant's position as an officer and director can be considered in determining knowledge and the degree of scienter. *Id.* at 913.

The second factor is "the isolated or recurrent nature of the infraction." *SEC v. Bonastia*, 614 F.2d at 912. "Although a single act in certain circumstances may warrant equitable relief, there is no *per se* rule requiring the issuance of an injunction upon the showing of a past violation." *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977). The court may also consider past misconduct in addition to convictions and pleas in determining whether there is a pattern. See *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 437 (D.N.J. 2000) (permitting the

testimony of two witness that alleged defendant had defrauded them although the complaint related to another of the defendant's clients); see also *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (stating that "past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct," but it is highly suggestive of future violations).

Third, the court considers "the defendant's recognition of the wrongful nature of his conduct." *SEC v. Bonastia*, 614 F.2d at 912. A defendant's "persistent refusal to acknowledge culpability is a factor in determining whether to impose injunctive relief." *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 495 (S.D.N.Y. 2002). The court may view the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted, since "persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction." *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (quoting *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996)). In *SEC v. Manor Nursing Centers, Inc.*, the court found "the fact that [the defendants] continued to maintain that their past conduct was blameless was a factor appropriately considered by the district court in assessing the need for a permanent injunction." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972).

The fourth factor is "the sincerity of his assurances against future violations." *SEC v. Bonastia*, 614 F.2d at 912. In *SEC v. Manor Nursing Centers, Inc.*, the Second Circuit found that "the district court had ample opportunity to evaluate the sincerity of appellants' assurances that they would not again violate the federal securities laws." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972). The fourth factor requires a weighing of the inconsistencies and conflicting stories told by the defendant. *Id.*

21

Finally, the fifth factor is "the likelihood, because of defendant's professional occupation, that future violations might occur." *SEC v. Bonastia*, 614 F.2d at 912. Courts have recognized that investment related professions "present[] opportunities for future securities violations." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004); *see also SEC v. Fehn*, 97 F.3d 1276, 1296 (9th Cir. 1996) (stating that since a significant portion of an attorney's "past practice involved representing clients in connection with the Securities Exchange Act of 1934" there was likelihood of future violations); *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d at 528 (evidence that the defendant was doing business as a mergers and acquisitions business consultant was used as an indicator of the likelihood of future violations). The District of Massachusetts has also indicated that the court should take into consideration the impact of an injunction on the operation of the defendant's business. *SEC v. Ingoldsby*, 1990 WL 120731, *3 (D. Mass. 1990).

As this Court stated on the record on October 13, 2009, genuine issues of material fact still exist as to tippee liability and summary judgment would not be appropriate at this time. For example, Sacks's testimony has not been consistent as to his knowledge of whether Teo was violating a fiduciary relationship by relaying material non-public information. Initially, in June 2002, Sacks declared that they did not discuss the purchase of C-Cube stock. However, during his plea hearing Sacks agreed that "Mr. Teo provided [him] with material, non-public information concerning C-Cube"; that he then accessed Bloomberg.com to obtain more information related to C-Cube; and that he purchased shares of C-Cube after he utilized information that he received by exceeding his authorized access to Bloomberg. At an August 7, 2008 deposition, Sacks returned to his original testimony that he did not believe at that time that Teo was providing him with material non-public information.

It follows that, summary judgment is not ripe on the issue of injunctive relief or disgorgement as this court has not made a determination as to liability. Both Sacks's and the SEC's motions are denied.

**CONCLUSION**

For the reasons discussed above, this Court **DENIES** the SEC's motion is in part and **GRANTS** in part, **DENIES** Teo and the Trust's motion, and **DENIES** Sacks's motion.

**S/SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: Madeline Cox Arleo, U.S.M.J.