NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITES AND EXCHANGE COMMISSION, | Civil Action No. 2:04-cv-01815 (SDW) (MCA) |
| Plaintiff, | |
| v. | **OPINION** |
| ALFRED S. TEO, SR., *et al.,* | |
| Defendants. | September 12, 2011 |

**WIGENTON**, District Judge.

Before the Court is Plaintiff's (1) Motion for Disgorgement, Prejudgment Interest, Civil Monetary Penalties, and Injunctive Relief, ("Disgorgement Motion"), (2) Motion to Appoint a Tax Administrator, and (3) Motion for Judgment as a Matter of Law.  Also before the Court is Defendant's Motion for Judgment as a Matter of Law and Defendant's Motion for a New Trial ("Defendant's Motions").  The Court, having considered the parties' submissions, decides this matter without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons discussed below, this Court **GRANTS** Plaintiff's Disgorgement Motion and Motion to appoint a tax administrator, **Dismisses as Moot** Plaintiff's Motion for Judgment as a Matter of Law, and **DENIES** Defendant's Motions.

**PROCEDURAL HISTORY**

The Securities and Exchange Commission ("SEC") filed a complaint against Defendants, Alfred Teo and the MAAA Trust, on April 22, 2004, listing several claims of insider trading and false filings.  Teo reached an agreement with the SEC regarding the insider trading claims (Claims 1, 4, and 5) on March 15, 2010, leaving only claims for violations of sections 10(b) and

13(d) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78m(d), and

Rules 10b-5, 12b-20, 13d-1, and 13d-2 , 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13d-1, and

240.13d-2; and a claim for violations of section 16(a) of the Exchange Act, 5 U.S.C. § 78p(a),

and Rules 12b-20 and 16a-3, 17 C.F.R. §§ 240.12b-20 and 240.16a-3.  In response to motions for

summary judgment, this Court issued an opinion on August 10, 2010, declaring that Teo was the

beneficial owner of shares of Musicland Stores Corporation ("Musicland") held by the MAAA

Trust[1] ("Trust").  In the same opinion, this Court held that Teo had committed violations of

section 16(a) by failing to include the Trust as a reporting entity in his filings between July 1998

and May 1999; not filing accurate statements of changes in beneficial ownership; and not filing

annual statements between June 1999 and December 2000.  The remaining claims were resolved

during a trial concluding on May 25, 2011.  The jury found that Teo and the Trust violated

section 13(d); Teo violated section 10(b); and the Trust violated section 16(a).

**FACTUAL HISTORY**

**A. Disgorgement Motion**

Alfred Teo obtained business and accounting degrees from Queens College.  (Pl.'s Ex.

137.)  Thereafter, he served as controller to the executive vice president and general manager of

a plastics manufacturing company in Brooklyn, New York.  *Id.*  Teo then developed his own

businesses leading to his overseeing "over 3,500 employees in 27 manufacturing plants."  *Id.*

Teo has also served as a member of the board of directors on a number of publicly held

corporations.  *Id.*

---

[1] The MAAA Trust was established in 1992 for the benefit of Mark, Andrew, Alan and Alfred
Jr., Teo's sons.  (Pl.'s Ex. 2.)

In February 1997, Teo controlled a total of twenty eight brokerage accounts, including accounts in the name of the Trust[2], holding 5.25 percent of the issued and outstanding shares of Musicland, a publicly traded specialty retailer that sold "prerecorded music and video products in mall stores." (Trial Tr. vol. 3, 72, 77, May 12, 2011; Trial Tr. vol. 7, 17-32, May 18, 2011.)  Teo reached 10 percent ownership on August 7, 1997.  (Trial Tr. vol. 7, 30.)  On August 2, 1998, Teo's ownership climbed to 17.79 percent and continued to increase, culminating in 35.97 percent on December 6, 2000.  (Trial Tr. vol. 7, 30-33.)  His ownership of Musicland's stock did not fall below the 17.5 percentile mark until January 2001, when Best Buy purchased all of the shares in a tender offer.  (Trial Tr. vol. 7, 31-32.)  During this time period, Teo reported a lower percentage of ownership of Musicland stock on his SEC filings than he actually owned and failed to disclose his beneficial ownership of shares held by the Trust. (Trial Tr. vol. 7, 64; *see* Pl.'s Exs. 111, 113, 121.)

Musicland's legal department relied on filings, including those under section 16(a) and section 13(d)[3], to keep track of shareholders owning over 5 percent of the company's stock. (Trial Tr. vol. 3, 81.)  This information was used to prepare proxy statements and for purposes of the company's shareholder rights' plan, commonly referred to as a "poison pill."  (Trial Tr. vol. 3, 81-83.)  The purpose of the poison pill was to prevent the hostile takeover of Musicland by an individual or group whose intentions were not in the best interest of Musicland or would be

---

[2] Shares held in the Trust were included in the calculation of Teo's total ownership because as explained in this Court's summary judgment opinion, Teo was the beneficial owner of Musicland shares held by the Trust.  In addition, Teren Seto Handelman, a former trustee of the Trust, testified that during her time as trustee, Teo would make decisions regarding trades and tell her to approve them.  (Trial Tr. vol. 3, 6-11.)

[3] Filings in accordance with section 13(d) are also referred to as a Schedule 13D.  *See* 17 C.F.R. § 240.13d-1.

unfair to other shareholders.  (Trial Tr. vol. 3, 83.)  The poison pill could be activated when an individual or group of people acquired 17.5 percent or more of the company's stock.  *Id.*  In the event of a shareholder activating the poison pill, the company had several courses of redress available, including diluting the acquiring party's stock value by allowing the remaining shareholders to buy large amounts of stock at a lower rate.  (Trial Tr. vol. 4, 11-12, May 13, 2011.)

As a result of both market sales and the tender offer, Teo sold all of the Musicland shares he controlled.   In total, the original cost to Teo of the Musicland shares was $89,453,549 and gross proceeds were $154,932,011, resulting in net profits from these sales of $65,478,462.  (Pl.'s Ex. at 387.)  Teo's first inaccurate filing was on July 2, 1998, when he disclaimed beneficial ownership of stock held by the Trust, prompting the SEC to seek to disgorge profits for trades occurring shortly thereafter.  (Pl.'s Ex. at 111.)  Of the profits realized after Teo's initial violation, $8,055,260 is attributable to trading in the Trust's accounts, and $13,032,085 is attributable to the other accounts controlled by Teo.  (Yanez Decl., 2.)  Therefore, the SEC seeks disgorgement of $21,087,345, the total profit gained after July 30, 1998; prejudgment interest; maximum penalties; and a permanent injunction against future violations of section 13(d) and 16(a), and Rules 13d-1, 13d-2, 12b-20 and 16a-3.  (Pl.'s Br.; Yanez Decl., 2.)

B.  **Defendants' Motion for Judgment as a Matter of Law**

The parties underwent a seven-day jury trial culminating in an unfavorable verdict for Defendants.  Defendants' Motion for Judgment as a Matter of Law concerns the theories supporting the SEC's claim that Teo violated section 13(d) of the Exchange Act.  During trial, the SEC argued, *inter alia*, that Teo violated section 13(d) by failing to disclose (1) plans and proposals for an extraordinary corporate transaction relating to Musicland and (2) plans and

proposals to change Musicland's Board of Directors.  To prove its case, the SEC relied on Teo's

conduct regarding the future of Musicland and his conduct regarding the Board of Directors.

### Extraordinary Corporate Transaction

Teo had plans to take Musicland private.  (Trial Tr. vol. 9, 117-20, May 20, 2011.)  To

execute his plan, Teo tried to engage the cooperation of other people and agencies.  In late 1999,

Teo reached out to Thomas Blaige, an investment banker at Goldsmith-Agio regarding Teo's

interest to take Musicland private.  (Trial Tr. vol. 5, 16-17, May 16, 2011.)  After speaking to

Teo, Mr. Blaige created a team that completed two weeks of financial analysis on the proposed

Musicland transaction.  (*Id.* at 22.)  Teo subsequently arranged a formal meeting between

himself, Mr. Blaige, Jack Eugster, Musicland's chairman and CEO, and Keith Benson,

Musicland's CFO. (*Id.* at 23.)  Ultimately, Mr. Eugster and Mr. Benson rejected the proposed

plan.  (Trial Tr. vol. 5, 38.)  After the Goldsmith-Agio proposal was rejected, Teo asked Mr.

Blaige to forward the Goldsmith-Agio analysis to Trivest Capital, another investment banking

firm.  (*Id.* at 50.)

After learning of Teo's desire to take Musicland private, Trivest Capital ("Trivest") sent

Teo a term sheet on February 7, 2000.  (Trial Tr. vol. 9, 128-30.)  The term sheet outlined a plan

for Teo and Trivest to work cooperatively on a management led buyout of Musicland.  (*Id.* at

128.)  On February 7, 2000, Teo signed the term sheet to indicate his approval of its contents.

(*Id.* at 131.)  On February 22, 2000, Trivest faxed Teo additional models for a corporate

reorganization of Musicland.  (Pl.'s Tr. Ex. 213.)  A few weeks after the term sheet was

executed, in March 2000, Teo, Mr. Eugster, and Mr. Benson attended a meeting with Trivest to

discuss the possibility of Musicland going private and the possibility of Trivest buying out

Musicland.  (Trial Tr. vol. 9, 141.)  Ultimately, the plan did not go forward.  (*Id.* at 141-42.)

Later, in the summer of 2000, Teo made another attempt to act upon his desire to take Musicland private.  (Trial Tr. vol. 4, 149.)  This time, Teo was assisted by Michael Messer, a New Jersey attorney whom Teo knew from previous business transactions.  (*Id.* at 147-48.)  In June 2000, while at a meeting on a matter unrelated to Musicland, Teo informed Mr. Messer of his stake in Musicland and his desire "to do something" with Musicland.  (*Id.* at 151.)  Sometime later, Mr. Messer introduced Teo to Edward Cooperman, a businessman and Mr. Messer's colleague.  (*Id.* at 152.)  The three had a meeting where Mr. Cooperman and Teo discussed, among other things, Teo's desire "to do something" with Musicland.  (*Id.* at 154.)

On or around September 15, 2000, Mr. Cooperman arranged for Teo and Mr. Messer to meet with Financo, Inc. ("Financo"), an investment banking firm.  (*Id.* at 157.)  The purpose of the meeting was to discuss Musicland going private.  (Trial Tr. vol. 4, 157.)  During the meeting, Teo called off further discussions about a possible transaction because he was advised by Musicland management that the company was in negotiations to be sold.  (*Id.* at 164.)  The day after the meeting, the chairman of Financo sent a proposal to Teo seeking to be retained as Teo's investment banking advisor in the sale of Musicland to a third party.  (*Id.* at 167.)  In the same letter, the chairman also proposed that, in the event Musicland was not sold to a third party, Financo would assist Musicland's management in a transaction to take Musicland private.  (*Id.* at 168-69.)  In November 2000, Teo and Financo executed an agreement whereby Teo retained Financo to represent his interest in the event Musicland was sold.  (Pl.'s Ex. 272 at FIN-Sec 576.)  In the event Musicland was not sold, Financo would seek other alternatives to maximize the value of Musicland shares, including the sale of Shareholder Group Shares and sale of the company.  (*Id.*)

**Board of Directors**

Beginning in December 1998, Teo made multiple attempts to join Musicland's board of directors. In December 1998, Teo wrote to Mr. Eugster, requesting that his desire to be on the board be presented to the Board of Directors and voted upon. (Trial Tr. vol. 9, 154.) Mr. Eugster obliged Teo's request, but the Board rejected Teo's nomination. (Trial Tr. vol. 5, 94-96.) After this failed attempt, Teo continued to seek membership on the Board, making a request once a month during the year 2000. (Trial Tr. vol. 10, 14-15, May 23, 2011.) Teo also attempted to join the Board by expressing his desire to Mr. Benson. (*Id.* at 16.)

In addition to Teo's efforts to become a board member, he also sought to have other individuals outside of Musicland join the board. (Trial Tr. vol. 5, 98); (Trial Tr. vol. 9, 39); (Trial Tr. vol. 10, 15.) In February 2000, Teo proposed Robert Smith, Larry Rosen, and John Tugwell for membership on the Board by sending letters to Mr. Eugster and Mr. Benson with each candidate's resume enclosed. (*Id.*) All of Teo's nominees were businessmen with experience serving on other public boards of directors. (Pl.'s Ex. 207, 207A.) Ultimately, the Board declined all of Teo's nominees. (Trial Tr. vol. 5, 98-100.)

Defendants seek a judgment as a matter of law that the SEC did not present sufficient evidence from which a jury could find Defendants liable for violating section 13(d) due to Teo's failure to disclose his plans for an extraordinary corporate transaction and changes to the board of directors.

**C. Defendants' Motion for a New Trial**

At trial, the SEC used Plaintiff's exhibit 103 ("PX103") to buttress its argument that Teo violated section 13(d). PX103 is an eighteen-page document containing bates numbers DAT 000041-000059, with page 000042 omitted. The document is a facsimile ("fax") dated July, 23

1998, from Mr. McKeon, Teo's longtime family attorney who represented Teo in a previous criminal matter brought by the SEC.  The first page of PX 103, DAT 000041, is a fax cover page illustrating the fax should contain sixteen pages.  The subject line of the fax cover page reads: "Re: Musicland Stores Corp. Amendment # 7 to 13D."  The message from Mr. McKeon to Teo reads "Please review and approve before I file this.  I also attach Form 4 for your approval before filing."   DAT 000043-59 is a draft of Amendment 7 to a Schedule 13D, which Mr. McKeon created by marking up Amendment 6 to a Schedule 13D that Teo filed in November 1997.  The SEC introduced PX103 as a document that Teo received from Mr. James McKeon to prove that Teo violated section 13(d).  PX103 was produced by Mr. McKeon to the United States Attorney's Office during Teo's criminal trial.  *See United States v. Teo, et al.*, 04-cr-583 (KSH), Docket Entry 163-1, Exhibit B (June 7, 2006.)

     During the resolution of pretrial issues in this case, the SEC used PX103 as an exhibit to support a motion to quash a subpoena brought by Teo against Mr. McKeon.  The SEC also included PX103 in its First Set of Proposed Stipulations on Admissibility which was provided to Defendants on April 3, 2011.  (Pl.'s Br. Ex. 2.)  Defendants objected to the use of PX103 as well as other documents on hearsay grounds.  After oral argument, this Court ruled that PX103 and the other related documents were admissible as party admissions by an agent under Federal Rule of Evidence 801(d)(2)(D).  (Trial Tr. vol. 2, 15-16 May 11, 2011.)  Also, PX103 was included in the Joint Proposed Final Pretrial Order ("Final Pretrial Order"), dated January 18, 2011.  In the Final Pretrial Order the parties agreed that any objections to authenticity not set forth in the order would be deemed waived.  Defendants objected to use of PX103 for the first time on May 19, 2011, the seventh day of trial.  This Court ruled in favor of the SEC.  Defendants now seek a new trial on the bases that: (1) PX103 was false evidence, and (2) the SEC engaged in attorney

misconduct by using PX103.  Defendants also seek a new trial on the grounds that assuming the

SEC proffered insufficient evidence regarding Teo's violation of section 13(d), it is impossible to

determine whether the jury's verdict was premised on legally insufficient evidence.

**DISCUSSION**

    A. **Disgorgement**

District Courts have "broad discretion in fashioning an appropriate disgorgement order."

*SEC v. Antar*, 97 F. Supp. 2d 576, 578 (D.N.J. 2000).  The purpose of the equitable remedy of

disgorgement is "to deprive a wrongdoer of his unjust enrichment and to deter others from

violating the securities laws."  *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir.

1989).  Although the remedy is used as a deterrent to violations of securities laws, it may not be

used punitively and must serve primarily to prevent unjust enrichment.  *Id.* at 1231.  Therefore,

"the court may exercise its equitable power only over property causally related to the

wrongdoing" and "the SEC generally must distinguish between legally and illegally obtained

profits."  *Id.* at 1231.

The disgorgement amount "need only be a reasonable approximation of profits causally

connected to the violation."  *Id.* at 1231; *see also SEC v. Antar*, 97 F. Supp. 2d at 578.   The

court in *SEC v. First City Financial Corporation* compared disgorgement for violations of

Schedule 13D to disgorgement in the insider trading context and explained that "courts typically

require the violator to return all profits made on the illegal trades" and the disgorgement is not

restricted "to the precise impact of the illegal trading on the market price."  890 F.2d at 1231-32.

The burden is on the SEC to demonstrate that its disgorgement amount "reasonably

approximates the amount of unjust enrichment."  *Id.* at 1232.  This burden is presumptively

satisfied when the SEC establishes the defendant's "actual profits on the tainted transactions."

*Id.*  The burden then shifts to the defendants to "clearly [] demonstrate that the disgorgement figure was not a reasonable approximation."  *Id.*   For example, a defendant may point to intervening events that disrupted the causal connection between the profits and the violation.  *See id.*; *see also SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993).

Preferably, the disgorgement amount would be "the difference between the sale price of the securities and what their market price would have been but for defendant's untimely and inaccurate filing."  *SEC v. Bilzerian*, 814 F. Supp. at 123.  Courts have recognized that this method of calculation may result "in actual profits becoming the typical disgorgement measure," but nonetheless "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  *SEC v. First City Fin. Corp.*, 890 F.2d at 1232; *see also SEC v. Sierra Brokerage Servs.*, 608 F. Supp. 2d 923, 968 (S.D. Ohio 2009) (stating that "[a]ll doubts concerning the amount of disgorgement must be resolved against the violator"); *see also SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996).

"As such, it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains."  *SEC v. Bilzerian*, 814 F. Supp. at 121.  Further, a reasonable approximation must suffice as it is "nearly impossible and speculative" to make determinations of what the market price would have been absent the illegal activity.  *Id.* at 123.

Defendants argue that "the profits that the SEC seeks to disgorge . . . are not causally related to any violation of section 13(d)" because the SEC did not prove "that the 13(d) violations found by the jury had any effect on the price of Musicland's stock."  (Defs.' Br. 12.) However, "[c]ourts are not required to engage in counterfactual scenarios to speculate about how much a defendant's disclosure violation inflated the market price of a security."  *SEC v. Sierra Brokerage Servs.*, 608 F. Supp. 2d at 969-70 (citing *SEC v. Bilzerian*, 814 F.Supp. at 123)

(dismissing the argument that defendants' "disclosure violations were not causally related to their profits from their subsequent sales of . . . shares because their failure to report their beneficial ownership was not fraudulent in nature and their disclosure violations are 'incidental to the central misconduct charged in the case'").

This Court cannot speculate as to how disclosure would have affected the market for Musicland stock or the poison pill, and thus the value of Teo's shares.  Several scenarios are possible: nothing could have happened, the poison pill could have been activated causing the shares to be diluted, or Teo could have been forced to sell his shares in order to lower his percentage of ownership.  This court also cannot speculate as to the effect the disclosure would have had on the prices of shares.  As stated above, any uncertainty must be resolved against the wrongdoer.

In addition, Defendants argue that "the Best Buy tender offer constituted an intervening event that broke any causal connection." (Defs.' Br. 14.)  Defendants rely on *Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) and *SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983).  In *Wellman v. Dickinson*, the Court held that the plaintiffs, a class of shareholders, did not suffer an injury as the result of the defendant's failure to file an accurate Schedule 13D.  *See generally* 682 F.2d 355.  The Court in *Wellman v. Dickinson* ascertained that the defendant's ability to sell his shares and obtain an over-the-market premium was not affected by his failure to file the required statements.  *Id.* at 368.  In *SEC v. MacDonald*, an insider trading case, the intervening event was the disclosure of information previously unknown to the public.  699 F.2d at 54. There, the Court held that the accurate amount of disgorgement was "a figure based upon the price of [the] stock a reasonable time after public dissemination of the inside information" and not the total profit.  *Id.* at 55.

The facts of those cases are not analogous to this case and therefore do not trigger the same issues.  First, the court in *Wellman v. Dickinson* was calculating shareholder losses for purposes of calculating damages and not profits relating to unjust enrichment or ill-gotten gains.  *See generally* 682 F.2d 355.  Secondly, the court in *SEC v. MacDonald* had evidence before it of the price the defendant would have obtained for his stock absent his illegal activity.  *See generally* 699 F.2d 47.  Neither is the scenario in this case.  Instead, as Plaintiff points out, the Best Buy tender offer constituted a market correction that Teo anticipated when he bought what he considered to be undervalued shares.

Moreover, this Court does not agree with Defendants' argument that disgorgement should not be ordered against the Trust as it would unfairly punish its beneficiaries.  Courts have determined that disgorgement is appropriate even when the beneficiaries of the illegal trades were not the wrongdoers.  *See SEC v. Antar*, 831 F. Supp. 380, 403 (D.N.J. 1993) (holding that the SEC is entitled to disgorgement of unlawful profits arising from sales of custodial stock); *see also SEC v. Glauberman*, No. 90 CV 5205 1992 U.S. Dist. LEXIS 10982 (S.D.N.Y. July 16, 1992) (holding that disgorgement was appropriate as to the accounts held for the benefit of minor children).

For the reasons stated above, this Court concludes that the actual profit obtained from Teo's illegal activity is $21,087,345, which includes the total profit realized after July 30, 1998, in the accounts Teo controlled, including those in the name of the Trust.  Defendants may deduct margin interest paid in connection to the trades taking place after July 30, 1998.  *See SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006) (explaining that defendants "might be entitled to offset expenses customarily incurred in the purchase and sale of such stock if the investor would have had to pay for such expenses in any legitimate transaction").  However,

Defendants also argue that any losses incurred due to transactions of Cirrus Logic shares should be deducted from the disgorgement amount because Plaintiff labeled those transactions as being part of the same "trading manipulation scheme." (Defs.' Br. 20.) This Court does not agree and will not credit Defendants for these losses. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (refusing to credit defendants for lost profits).

Furthermore, "where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained funds." *SEC v. Olins*, 762 F. Supp. 2d 1193, 1197 (N.D. Cal. 2011) (citation and internal quotations omitted). Although apportionment is reasonable when the tortfeasor can establish "that the liability is capable of apportionment, . . . the district court has broad discretion in subjecting the offending parties on a joint-and-several basis to the disgorgement order." *SEC v. Hughes Capital Corp.*, 124 F.3d at 456 (3d Cir. 1997). This Court will exercise its discretion in finding Teo and the Trust jointly and severally liable because of the history of entanglement of transactions and funds between the two.

## B. **Interest**

District Courts have the discretion to order payment of prejudgment interest "upon 'considerations of fairness.'" *SEC v. Antar*, 44 F. App'x 548, 552 (3d Cir. 2002) (quoting *Bd. of Comm'rs of Jackson Cnty., Kansas v. United States*, 308 U.S. 343, 352 (1939)); *see also SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1089-90 (D.N.J. 1996). Further, "prejudgment interest may be denied 'when its exaction would be inequitable.'" *SEC v. Antar*, 44 F. App'x. at 553 (allowing prejudgment interest to be charged on illegal profits held in accounts for the benefit of minors although the interest period was set to begin as of the date of the complaint and not the date of the unlawful activity). It is also within a district court's discretion to permit the

use of the Internal Revenue Service ("IRS") underpayment rate to calculate prejudgment interest

on disgorgement.  *SEC v. Hughes Capital Corp.*, 917 F. Supp. at 1089-90; *SEC v. Rosenthal*, No.

10-1204-CV, 2011 U.S. App. LEXIS 11732 (2d Cir. June 9, 2011).  This Court has not been

presented with any evidence that would permit a reduction in prejudgment interest for

considerations of fairness.  Therefore, prejudgment interest will be charged at the IRS

underpayment rate and is to be calculated from January 2001, the date on which Teo realized his

latest profits in connection with the transactions at issue in this case.

## C. **Penalties**

Violators of the securities laws may be subject to three tiers of civil monetary penalties.

*SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005).  The generally applicable penalties are those in

Tier I.  *Id.*  "Tier II penalties require 'fraud, deceit, manipulation, or a deliberate or reckless

disregard of a regulatory requirement'"; and "Tier III penalties require the Tier II elements plus

'substantial losses or . . . significant risk of substantial losses to other persons.'" *Id.*  The

maximum penalty is set within the Tier; however, district courts have the discretion to set the

actual amount of the penalty.  *Id.*  The jury in this case found that Teo used "manipulative and

deceptive devices" as required for a section 10(b) violation. 15 U.S.C. § 78j(b).  Therefore, he is

subject to the maximum penalty permitted under Tier II for each violation.  The Trust shall be

penalized at the maximum permitted for "other persons" under Tier I.

## D. **Injunction**

If it appears to the SEC "that a person is engaged in acts in violation of the securities

laws, an action to enjoin those acts may be brought and, upon a proper showing by the [SEC],

the court shall grant the injunctive relief requested."  *SEC v. Bonastia,* 614 F.2d 908, 912 (3d

Cir. 1980).  The purpose of injunctive relief is not punitive but is to protect the investing public

and deter future infractions of the securities law.  *Id.*  The Third Circuit set out five factors to guide courts in determining "whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct," and to therefore grant a permanent injunction. *Id.* The five factors should not be assessed individually, instead the totality of the circumstances should be considered in reaching a decision.  *Id.*

The first factor courts consider is "the degree of scienter involved on the part of the defendant."  *Id.*  The second factor is "the isolated or recurrent nature of the infraction."  *SEC v. Bonastia*, 614 F.2d at 912.  "Although a single act in certain circumstances may warrant equitable relief, there is no *per se* rule requiring the issuance of an injunction upon the showing of a past violation."  *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir. 1977).  The court may also consider past misconduct in addition to convictions and pleas in determining whether there is a pattern.  *See CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 437 (D.N.J. 2000) (permitting the testimony of two witnesses that alleged that the defendant had defrauded them although the complaint related to another of the defendant's clients); *see also CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (stating that "past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct," but it is highly suggestive of future violations).

Third, courts consider "the defendant's recognition of the wrongful nature of his conduct."  *SEC v. Bonastia*, 614 F.2d at 912.  A defendant's "persistent refusal to acknowledge culpability is a factor in determining whether to impose injunctive relief."  *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 495 (S.D.N.Y. 2002).  Courts may view the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted, since "persistent refusals to admit any wrongdoing make it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of

an injunction." *SEC v. First Jersey Sec.,* 101 F.3d 1450, 1477 (2d Cir. 1996) (quoting *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996)).

The fourth factor is "the sincerity of his assurances against future violations." *SEC v. Bonastia*, 614 F.2d at 912.  In *SEC v. Manor Nursing Ctrs., Inc.,* the Second Circuit found that "the district court had ample opportunity to evaluate the sincerity of appellants' assurances that they would not again violate the federal securities laws." 458 F.2d 1082, 1101 (2d Cir. 1972). Finally, the fifth factor is "the likelihood, because of defendant's professional occupation, that future violations might occur." *SEC v. Bonastia*, 614 F.2d at 912.

Although Defendants have contested the issuance of an injunction in the past, they do not appear to do so in the papers submitted in response to the Disgorgement Motion.  An injunction against future violations is appropriate in this case against both Teo and the Trust.  The jury found the requisite degree of scienter required for these violations.  Although the present violations only pertain to Musicland shares, Teo has been connected with other inappropriate or illegal trades.  Throughout the trial, Teo continued to deny wrongdoing and beneficial ownership of the shares held by the Trust.  This Court has not received any assurances against future violations.  For these reasons, injunctive relief is appropriate.

### E.  Judgment as a Matter of Law

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) "should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *see also Mandile v. Clark Material Handling Co.*, 131 F. App'x 836, 838 (3d Cir. 2005). "In determining whether the evidence is sufficient to sustain liability, the

16

court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166 (citing *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 190 (3d Cir.1992)). "A judge may overturn a jury verdict only when, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d 266, 268 (3d Cir. 2004) (quotations omitted). However, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube*, 4 F.3d at 1166 (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978)). Defendants argue that the record in this case is devoid of evidence that Teo had solid plans to take Musicland private and change the makeup of Musicland's board of directors.

"A beneficial owner of more than five percent of a class of a company's stock must file a Schedule 13D to meet the disclosure requirements of section 13(d)." *Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 490 (S.D.N.Y. 2009) *aff'd sub nom Thesling v. Bioenvision Inc.*, 374 F. App'x 141 (2d Cir. 2010). Schedule 13D requires in pertinent part that holders of five percent or more of the beneficial shares of a company publicly report plans or proposals by the reporting holder that would result in: (1) an extraordinary corporate transaction, such as a merger, reorganization, or liquidation, involving the issuer or any of its subsidiaries; or (2) any change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board. However, section 13(d) does not require disclosure of "preliminary considerations, exploratory work or tentative plans." *Azurite Corp. Ltd. v. Amster & Co.*, 844 F. Supp. 929, 934 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 15 (2d Cir. 1995). Plans or proposals should be disclosed where a course of action

has been decided upon or intended.  *Vladimir*, 606 F. Supp.2d at 491 (citing *Azurite Corp. Ltd.*, 52 F.3d at 18).   It is important to note that plans or proposals should be disclosed if they *would* result in an extraordinary corporate transaction or change in the present board of directors.

### 1.   Musicland Going Private

Defendant Teo worked with several investment banking firms to effectuate his plan to take Musicland private.  At trial, the SEC highlighted some of the meetings Teo had with certain firms to demonstrate that Teo's plans were such that they should have been disclosed on Schedule 13D.  Particularly, the SEC showed that Teo worked with Goldsmith-Agio, Trivest, and Financo, each time with the intent to take Musicland private.  However, Defendants argue in their brief that Teo's transactions with investment banking firms regarding the privatization of Musicland were preliminary and in their embryonic stage.  Defendants note that Mr. Blaige's testimony supports their assertion that Teo's plans were preliminary.  *See* (Trial Tr. vol. 5, 47) (Testimony of Mr. Blaige where he described his work for Teo as preliminary and embryonic). Defendants also argue that Teo's testimony at trial made it clear that he did not have a solid plan to take Musicland private.  *See* (Trial Tr. vol. 9, 116.)  However, at trial, the SEC impeached Teo's testimony with prior inconsistent testimony where Teo stated that for two years he tried to take Musicland private.  *See id.* at 120.  Further, Defendants did not dispute that Teo met with three different investment banking agencies regarding taking Musicland private.  Viewing the evidence in the light most favorable to the SEC, and giving it the advantage of every fair and reasonable inference, this Court concludes that the jury had sufficient evidence upon which to determine whether Teo's plans and proposals regarding Musicland would have resulted in an extraordinary corporate transaction requiring disclosure on Schedule 13D.

### 2.   **Change to Musicland's Board of Directors**

Teo sought, albeit to no avail, to become a member of Musicland's board of directors.
After being rejected by the board, Teo sought, again to no avail, to place others outside of
Musicland on the board.  Defendants argue that Teo's conduct regarding the board of directors
did not have to be disclosed on a Schedule 13D because he was never seriously considered to be
a board member, and his nomination of others for board membership were preliminary and
ultimately unsuccessful.  The SEC argues that, viewing the evidence in the light most favorable
to it, Teo's plans regarding the membership of the board of directors were neither tentative,
preliminary, nor exploratory.  *Azurite*, 844 F. Supp. at 934.

While Teo was unsuccessful both in becoming a member of the board of directors and in
nominating members to the board, his success in achieving his plans is irrelevant for purposes of
the Court's analysis.  It is undisputed that Teo sought membership during a three-year period and
it is also undisputed that Teo nominated three individuals to the board.  Viewing the evidence in
the light most favorable to the SEC, and giving it the advantage of every fair and reasonable
inference, this Court concludes that there was sufficient evidence for the jury to consider whether
Teo's plans would have resulted in a change to the board of directors, thus requiring that they be
disclosed on a Schedule 13D filing.

### F.  **JUDGMENT FOR A NEW TRIAL**

Motions for a new trial are governed by Federal Rule of Civil Procedure 59(a) which
provides in pertinent part that: "The court may, on motion, grant a new trial on some or all of the
issues . . . for any reason for which a new trial has heretofore been granted in an action at law in
federal court . . . ."  FED. R. CIV. P. 59(a).  There are several reasons for which a new trial may be

granted.  Here, Teo argues that a new trial should be granted due to (1) the use of false evidence,

(2) attorney misconduct by the SEC, which resulted in a reasonable probability that the jury's

verdict was influenced by the misconduct, and (3) because it is impossible to determine whether

the jury's verdict was premised on legally insufficient evidence.

### Use of False Evidence

"[T]he pretrial order controls the subsequent course of . . . trial unless modified to prevent

manifest injustice." *Shell Petroleum, Inc., v. United States*, 182 F.3d 212, 218 (3d Cir. 1999).

Defendants argue that the SEC used false evidence by combining documents to make PX103

since PX103 is eighteen pages instead of sixteen as indicated on the fax cover page, and since

page 000042 is omitted from PX 103.  Defendants argue that given the defects in PX103, Teo

could not have received PX103.  Regardless of the strength or weakness of Defendants'

argument, their argument must fail because of its timing.  PX103 was included on the SEC's

exhibit list submitted to this Court on January 18, 2011 as part of the Joint Proposed Final

Pretrial Order.  Defendants failed to object to the authenticity of PX 103 when it was disclosed in

the pretrial order.  Rather, Defendants waited until the seventh day of trial to object to its

authenticity.  The parties agreed in the pretrial order that any authenticity objections not set forth

in the order were waived.  Accordingly, pursuant to the Joint Pretrial Order in this case,

Defendants waived their authenticity objection regarding PX 103.

### Attorney Misconduct

A trial judge has "considerable discretion in determining whether conduct by counsel is

so prejudicial as to require a new trial."  *Draper v. Airco*, 580 F.2d 91, 94 (3d Cir. 1978).

Generally, new trials are granted due to attorney misconduct where the misconduct was

pervasive.  *See, e.g.*, *Blanch Rd. Corp. v. Bensalem Twp.*, 57 F.3d 253, 264 (3d Cir. 1995)

(affirming a grant of new trial where "counsel for Plaintiffs pursued a pattern of misconduct from opening statement through final argument" and "the record [was] replete with examples of counsel misconduct that might have influenced the jury") *overruled on other grounds by  United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 206-07 (3d Cir. 1992) (affirming a grant of new trial on finding that attorney misconduct was pervasive); *Draper v. Airco, Inc.*, 580 F.2d 91, 96-97 (3d Cir. 1978) ("Where, however, a closing address to the jury contains such numerous and serious violations of so many rules of proper argument as occurred here, we must conclude that it is more than reasonably probable that the verdict was influenced by the prejudicial statements").  In this case, Defendants' contention regarding attorney misconduct is premised on their argument that PX103 is false evidence.  However, since the authenticity of PX103 is a non-issue, there could not have been attorney misconduct regarding any use or reference to PX 103.  Therefore, Defendants' argument regarding attorney misconduct is meritless.

### Evidence Supporting the Jury's Verdict

Given this Court's denial of Defendants' Motion for Judgment as a Matter of Law regarding the sufficiency of evidence supporting the jury's verdict, Defendants' argument that it is impossible to determine whether the jury's verdict was premised on legally insufficient evidence cannot stand.

### G.  Plaintiff's Motion for Judgment as a Matter of Law

On May 24, 2011, the SEC moved for a Judgment as a Matter of Law that the Trust failed to disclose in its section 16(a) filing that it was a beneficial ownership of Musicland stock.  In light of the jury's verdict, the SEC's motion is denied as moot.

H. **Plaintiff's Motion to Appoint a Tax Administrator**

On June 23, 2011, the SEC filed a Motion to Appoint a Tax Administrator.  Pursuant to this Court's previous judgments, Defendants and the relief Defendant have deposited funds with the Clerk of Court in an interest bearing account.  The funds deposited with the Clerk of Court constitute the Distribution Fund.  The Distribution Fund constitutes a Qualified Settlement Fund (QSF) pursuant to section 468B(g) of the Internal Revenue Code (IRC) 26 U.S.C. § 468B(g), and related regulations, 26 C.F.R. §§ 1.468B-1 through 1.468B-5.  Plaintiff seeks the appointment of a tax administrator on behalf of the Distribution Fund to ensure that the fund obtains and maintains the status of a QSF which would include the filing of all required elections and statements, and the payment of all necessary taxes.  The Court grants Plaintiff's unopposed motion.

**CONCLUSION**

For the reasons discussed above, this Court grants the SEC's request for disgorgement, prejudgment interest, civil monetary penalties, and injunctive relief.  This Court holds that:

1. Disgorgement is appropriate as to both Teo and the Trust for all profits gained from the sale of Musicland shares beginning July, 30, 1998, that is $21,087,345.

2. The disgorgement amount shall be reduced by the margin interest paid in connection with the trades of Musicland shares taking place after July 30, 1998.

3. Teo and the Trust are jointly and severally liable for the disgorgement amount and prejudgment interest.

4. Prejudgment interest will be charged at the IRS underpayment rate and is to be calculated from January 2001.

5. Teo is subject to the maximum penalty permitted per violation under Tier II.

6.   The Trust is subject to the maximum penalty permitted per violation under Tier I.

7.   Injunctive relief is granted to the SEC against both Teo and the Trust.

8.   The SEC is directed to submit an order, within thirty (30) days of this opinion, with amended calculations of the disgorgement amount, prejudgment interest, and civil monetary penalties.

Furthermore, this Court grants the SEC's Motion to Appoint a Tax Administrator. However, this Court denies as moot the SEC's Motion for Judgment as a Matter of Law. Finally, this Court denies Defendants' Motion for Judgment as a Matter of Law and Defendants' Motion for a New Trial.


**S/SUSAN D. WIGENTON, U.S.D.J.**


Orig:  Clerk
cc:  Madeline Cox Arleo, U.S.M.J.